1997-NMCA-069

943 P.2d 560

**Charles E.NEARBURG, dba Nearburg Exploration Company, Plaintiff– Appellant,**

v.

**YATES PETROLEUM CORPORATION, a New Mexico Corporation, Defendant–Appellee.**

**No. 16783.**

Court of Appeals of New Mexico.

June 10, 1997.

Certiorari Denied July 29, 1997.

Steven L. Tucker, Tucker Law Firm, P.C., Santa Fe, for Appellant.

Ernest L. Carroll, Mary Lynn Bogle, Losee, Carson, Haas & Carroll, P.A., Artesia, for Appellee.

Robert G. West, Michener, Larimore, Swindle, Whitaker, Flowers, Sawyer, Reynolds & Chalk, L.L.P., Fort Worth, TX., Harold D. Stratton, Jr., Stratton & Cavin, P.A. Albuquerque, for Amicus Curiae, American Association of Professional Landmen.

## OPINION

WECHSLER, Judge.

1. The opinion filed in this case on April 17, 1997 is hereby withdrawn and the following substituted therefor. Yates Petroleum Corporation's motion for rehearing is denied.

2. Operating agreements are commonly used in the oil and gas industry in New Mexico and other producing states to set forth the arrangement between interest owners as to exploration and development of jointly owned interests. *See generally* Gary B. Conine, *Property Provisions of the Operating Agreement—Interpretation, Validity, and Enforceability,* 19 Tex.Tech L.Rev. 1263, 1265 n. 3 (1988) [hereinafter Conine, *Property Provisions*] (citing numerous articles on operating agreements). The issue in this appeal is whether the failure of Defendant Yates Petroleum Corporation (Yates) to give timely notice of election to participate in a drilling operation proposed by Plaintiff Nearburg Exploration Company (Nearburg) subjects Yates to a non-consent penalty under the parties' operating agreement. We hold that it does and reverse the decision of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

3. Nearburg and Yates are joint owners of a leasehold estate in Eddy County, New Mexico, under a New Mexico Oil and Gas Lease. On January 15, 1993, the parties entered into an operating agreement to drill oil and gas wells on that estate. The operating agreement was prepared by Yates and is

**530**

based on a preprinted Model Form Operating Agreement published by the American Association of Professional Landmen, A.A.P.L. Form 610–1977. The critical provisions relevant to the issue on appeal were not changed from the Model Form, Article VI(B)(1) and (2).[1] Under these provisions, after the initial well is drilled, either party can propose to drill an additional well by giving the other party written notice of the proposed operation. *See* Art. VI(B)(1), A.A.P.L. Form 610–1977. The other party has thirty days after receipt of the notice in which to give notification of whether it elects to participate in drilling that particular well. Failure to respond within this period consti-

1. Art. VI(B), A.A.P.L. Form 610–1977, provides:

1. *Proposed Operations:* Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A. [the initial well], ... the party desiring to drill ... such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation.... Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

2. *Operations by Less than All Parties:* If any party receiving such notice ... elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within sixty (60) days after the expiration of the notice period of thirty (30) days ... actually commence work on the proposed operation and complete it with due diligence....

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of (a) the total interest of the parties approving such operation, and (b) its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday or legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non–Consenting Parties' interest. The proposing party, at its election, may withdraw such proposal if there is insufficient participation, and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties [in] the proportions they have elected to bear same under the terms of the preceding paragraph.... If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well at their sole cost, risk and expense. If any well drilled ... results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non–Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non–Consenting [Parties'] interest in the well and share of production therefrom until the proceeds of the sale of such share ... [shall] equal the total of the following:

(a) 200% of each such Non–Consenting Party's share of the cost of any newly acquired surface equipment ... plus 100% of each such Non–Consenting Party's share of [the] cost of operation of the well commencing with first production and continuing until each such Non–Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non–Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non–Consenting Party had it participated in the well from the beginning of the operation; and

(b) *500%* of that portion of the costs and expenses of drilling ...; *500%* of that portion of the cost of newly acquired equipment in the well (to and including the well head connections), which would have been chargeable to such Non–Consenting Party if it had participated therein.
....

If and when the Consenting Parties recover from a Non–Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non–Consenting Party shall automatically revert to it, and, from and after such reversion, such Non–Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non–Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging back of said well. Thereafter, such Non–Consenting Party shall [be] charged with and shall pay its proportionate part of the further costs of the operation of said well [in] accordance with the terms of this agreement and the Accounting Procedure, attached hereto.

tutes an election not to participate in the cost of the proposed operation, according to Article VI(B)(1) of the operating agreement. If one party proposes a drilling operation and the other party does not elect to participate, the former is called the "consenting party" and the latter the "non-consenting party."

4. The consenting party may proceed with the drilling project, bearing the entire cost and risk, even if the other party is non-consenting. If the consenting party "actually commence[s] work" within sixty days as required by Article VI(B)(2) and if the well produces, the non-consent penalty provision states that the consenting party is allowed to recoup up to 200% of its cost of new surface equipment and up to 500% of its cost of drilling and new equipment in the well before the non-consenting party shares in the production. Thereafter the non-consenting party shares equally in any further proceeds. *See* Art. VI(B)(2), Form 610–1977.

5. In accordance with the operating agreement, Nearburg sent Yates a certified letter proposing to drill an additional well, "Boyd 'X' # 5." Yates received this letter on December 1, 1994, but failed to respond within thirty days. Yates did, however, send Nearburg a letter dated January 11, 1995, stating that Yates proposed to drill the Boyd 'X' # 5 well. On December 29, 1994, Yates also obtained a permit to allow Yates to drill the Boyd 'X' # 5 well.

6. Nearburg then filed a complaint alleging that Yates' actions violated Nearburg's rights under the operating agreement and prevented Nearburg from obtaining a drilling permit for Boyd 'X' # 5. Nearburg requested the following relief: a declaratory judgment that Nearburg is the operator of the Boyd 'X' # 5 well; an order for specific performance requiring Yates to act as a non-consenting party and to refrain from interfering with Nearburg's proposed drilling of Boyd 'X' # 5; and an order enjoining Yates from proceeding to drill the Boyd 'X' # 5 well itself or interfering with Nearburg's proposed drilling of Boyd 'X' # 5, including preventing Nearburg from obtaining a drilling permit for Boyd 'X' # 5. Yates counterclaimed for a declaratory judgment that Yates was the operator of the Boyd 'X' # 5

well and that Yates was a consenting party under the operating agreement. The district court dismissed Nearburg's complaint with prejudice and entered a declaratory judgment that Yates was to be considered a consenting party under the operating agreement. Nearburg appeals.

## II. DISCUSSION

### A. Standard of Review

■■■ 7. Interpretation of an unambiguous contract is a question of law which we review de novo. *Peck v. Title USA Ins. Corp.*, 108 N.M. 30, 33, 766 P.2d 290, 293 (1988). Whether a contract contains an ambiguity is also a question of law reviewed de novo. *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781–82, 845 P.2d 1232, 1235–36 (1993). A contract is ambiguous if the court determines it can reasonably and fairly be interpreted in different ways. *Id.* at 781, 845 P.2d at 1235.

■■■ 8. Although Nearburg and Yates argue for different interpretations of the critical contract provisions, neither party argues that the operating agreement is ambiguous. *See Kirkpatrick v. Introspect Healthcare Corp.*, 114 N.M. 706, 711, 845 P.2d 800, 805 (1992) (ambiguity not established simply because parties differ on contract's proper construction). Since resolution of the issue on appeal depends upon interpretation of documentary evidence, we are in as good a position as the district court to interpret the operating agreement. *See id.* We consider the operating agreement as a whole in determining how it should be interpreted. *See id.*

■■■ 9. To the extent, however, that the district court granted equitable relief, we review its decision for abuse of discretion. *See City of Albuquerque v. Brooks*, 114 N.M. 572, 574, 844 P.2d 822, 824 (1992); *Wolf & Klar Cos. v. Garner*, 101 N.M. 116, 118, 679 P.2d 258, 260 (1984).

### B. Characterization of Non–Consent Penalty Provisions

■■■ 10. We note preliminarily that, although we follow custom by referring to the operating agreement provisions at issue as a

"penalty," they do not meet the definition of a penalty as set forth in the Restatement and *Corbin on Contracts*. *See* Restatement (Second) of Contracts § 356 (1981); 5 Arthur Linton Corbin, *Corbin on Contracts* § 1057 (1964). A penalty is a term fixing unreasonably large liquidated damages and is ordinarily unenforceable on grounds of public policy because it goes beyond compensation into punishment. *See* Restatement, *supra*, § 356(1) & cmt. a; 5 Corbin, *supra*, § 1057, at 334. It has been held that a non-consent penalty similar to the one at issue in this appeal was a valid liquidated damages provision rather than an unenforceable penalty provision. *See Hamilton v. Texas Oil & Gas Corp.*, 648 S.W.2d 316, 321 (Tex.Ct.App. 1982). We do not agree with the *Hamilton* court's analysis because a liquidated damages provision applies in case of a breach of contract. The parties to the operating agreement are not obligated to participate in all proposed operations, and a non-consent election cannot convincingly be characterized as a breach. *See* Gary B. Conine, *Rights and Liabilities of Carried Interest and Nonconsent Parties in Oil and Gas Operations*, 37 Inst. on Oil & Gas L. & Tax'n § 3.04[3][c], at 3–32 (1986) [hereinafter Conine, *Carried Interest*]. Therefore, we do not regard the non-consent penalty provision as involving liquidated damages or an unenforceable penalty.

■11. Turning to the parties' arguments concerning the non-consent penalty provisions, Yates asserts that an election not to participate constitutes an offer to relinquish the party's interest in production from a proposed operation, and that this offer can be accepted by the proposing party's action in "actually commencing work" within sixty days of the end of the election period. *See* Art. VI(B)(2), A.A.P.L. Form 610–1977. Therefore, until Nearburg, the proposing party, accepts by this performance, Yates argues that it has the right to change its election by withdrawing its offer. Yates states that it terminated its offer to relinquish by its January 11, 1995 letter communicating its intent to participate in the drilling of Boyd 'X' # 5.

12. We find this position to be a strained interpretation of the operating agreement. *See Kirkpatrick*, 114 N.M. at 711, 845 P.2d at 805 (court should avoid strained interpretation of contract). In addition, this analysis is inconsistent with express contract language, because it virtually ignores the provision in Article VI(B)(1) requiring an election to be made within thirty days. *See id.* (interpretation cannot ignore express provisions of contract). Yates' analysis also fails to give any real significance to the fact that the parties have already agreed, in signing the operating agreement, to the relinquishment resulting from the operation of the non-consent penalty provisions. *See Bank of N.M. v. Sholer*, 102 N.M. 78, 79, 691 P.2d 465, 466 (1984) (contract must be construed as harmonious whole with every phrase given meaning and significance).

■ 13. Nearburg argues that the operating agreement provisions at issue create an option. Under this analysis, Nearburg's proposal to Yates that they jointly drill Boyd 'X' # 5 was an offer. Because Nearburg was bound by Article VI(B)(1) of the operating agreement to keep this offer open for thirty days, Nearburg concludes that the proposal was an option. When an option is involved, time is of the essence. 3 Eric Mills Holmes, *Corbin on Contracts* § 11.17, at 601 (rev. ed. 1996). Under this analysis, Yates' attempted notification by letter dated January 11 was too late and therefore ineffective. We do not adopt Nearburg's option analysis.

■ 14. Nearburg cites *Harper Oil Co. v. Yates Petroleum Corp.*, 105 N.M. 430, 431, 733 P.2d 1313, 1314 (1987), for the proposition that a provision giving a party a "right to elect" whether to join in a proposed drilling operation creates an option. Although *Harper Oil Co.* uses the word "option," we believe that the term is used in the sense of "choice" or "election" among alternatives rather than as an irrevocable offer creating a power of acceptance. *See* 3 Holmes, *supra*, § 11.1, at 461. "An option contract is a promise which meets the requirements for the formation of a contract and limits the promisor's power to revoke an offer." Restatement, *supra*, § 25, at 73; *see Zobel v.*

*Dale Bellamah Land Co.,* 78 N.M. 586, 587, 435 P.2d 205, 206 (1967).

15. If an election to participate by Yates within thirty days would have created a contract between Nearburg and Yates to drill Boyd 'X' # 5, Nearburg's argument might be persuasive. The difficulty with Nearburg's option analysis is that it is not clear from the operating agreement that Nearburg would have been bound to proceed with drilling Boyd 'X' # 5 if Yates had made a timely election to participate.[2] Yates states in its brief that: "There is no obligation on the Consenting Party to drill the well once he receives the other party's election to participate or not to participate." In its briefs and in oral argument, Nearburg does not appear to disagree. If Nearburg was not obligated to proceed even if Yates accepted, Nearburg's proposal did not constitute an offer and did not create in Yates the power of creating a contract by acceptance. *See* Restatement, *supra,* §§ 24, 25.

▪ 16. Nearburg characterizes the non-consent penalty as a limitation on profits which Yates would incur as a cost of avoiding the risk of drilling a dry or non-productive well. The consenting parties bear the entire cost and risk of the operation. *See* Art. VI(B)(2), A.A.P.L. Form 610–1977. If a non-consenting party, without sharing in the risk, were entitled to share equally in the proceeds, most operating companies would not be willing to undertake a drilling operation. Guy E. Wall, *Joint Oil and Gas Operations in Louisiana,* 53 La.L.Rev. 79, 108 (1992). We agree with Nearburg's characterization that "the non-consent penalty is the agreed-upon reward to [a consenting party] for taking the risk and the agreed-upon delay or limitation of profits incurred by [a non-consenting party] for avoiding it." *See Hamilton,* 648 S.W.2d at 321; Conine, *Property*

*Provisions, supra,* at 1296. The parties have agreed to reward risk-taking which benefits mutual interests by temporarily reallocating interests in production until the party electing to assume the risk has received an agreed-upon return on its investment. *See* Conine, *Carried Interest, supra,* § 3.04[3][c], at 3–32; Conine, *Property Provisions, supra,* at 1286. The non-consent penalty provisions create a carried interest. *See* 5 Eugene Kuntz, *A Treatise on the Law of Oil and Gas* § 63.4, at 250–51 (1991); Conine, *Carried Interest, supra,* §§ 3.04[1], 3.01, at 3–3 n. 7. As a contractual arrangement, the carried interest is subject to negotiation and modification, and the parties' rights and obligations depend upon their contract. *See Berryhill v. Marshall Exploration, Inc.,* 420 F.Supp. 198, 203 (W.D.La.1976), *aff'd,* 602 F.2d 990 (5th Cir.1979); Conine, *Carried Interest, supra,* § 3.03[1], at 3–12.

▪ 17. We characterize the non-consent penalty provisions, not as an option, but as a covenant triggered by a condition precedent, *see* Conine, *Carried Interest, supra,* § 3.04[3][c], or, in the Restatement's terminology, a covenant or promise subject to a condition, Restatement, *supra,* § 224 cmt. e. Section 224 of the Restatement defines a condition as an "event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." The covenant is the agreement by the non-consenting party to temporarily relinquish the specified amount of its interest in production in exchange for the consenting party bearing the risk of the operation. The condition is the election not to participate in the proposed operation, made either expressly or tacitly by failure to respond within thirty days. The operating agreement also provides that "in order to be entitled to the benefits of this

---

2. We note that A.A.P.L. Form 610 has been revised several times and that the 1989 version includes an express provision in Article VI(B)(1) requiring the proposing party to proceed if all parties elect to participate: "If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days ... actually commence the proposed operation and thereafter complete it with due diligence...." *See* A.A.P.L. Form 610–1989, reprinted in 6 W.L. Summers, *The Law of Oil and Gas* § 1328.2, at 447 (by John S. Lowe, Supp.1996). A similar provision is included in Form 3, Art. 9, § 9.2 (1959), published by Rocky Mountain Oil & Gas Ass'n, reprinted in 7 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* § 920.5, at 920–211 (1995).

article [Article VI, providing for non-consent penalty]," the consenting party must "actually commence work on the proposed operation" within sixty days after the expiration of the thirty day notice period. *See* Art. VI(B)(2), A.A.P.L. Form 610–1977. We assume, without deciding, that this requirement constitutes an additional condition on the application of the non-consent penalty provisions. It is a condition, however, that is wholly within the control of the consenting party, and, provided that party meets the sixty day limit, the consenting party is entitled to the non-consent penalty. *See* Restatement, *supra*, § 227 cmt. b, at 176 (condition may be event within control of one party). This condition provides no opportunity for the non-consenting party to change its election between the end of the thirty day notice period and actual commencement of operations.

### C.  District Court's Decision

18.  The district court determined that the operating agreement did not address "whether a party, having once made an election by inaction, can change that election and decide to participate before the other party is prejudiced or has taken substantial actions to their detriment relying upon the non-participation of the other party." The court found that Yates' "failure to respond to the request to drill the well was due to inadvertence and Yates notified ... Nearburg that [Yates] intended to drill the well before [Nearburg] was prejudiced in any way." The court concluded that "[Yates] should be allowed to retract or change [Yates'] election not to participate in the drilling of the proposed well because the agreement, if interpreted in any other way, would act as a forfeiture which is disfavored in New Mexico." After dismissing Nearburg's complaint, the district court declared that Yates should be allowed to change its election and that Yates was to be considered a consenting party for the drilling of Boyd 'X' # 5.

19.  We believe that the district court's decision contains elements of both contract interpretation and equitable relief. We conclude that the court's interpretation of the contract is not reasonable and that equitable relief was not warranted.

### 1.  Contract Interpretation

██ 20.  The district court is correct that, as a general principle of contract interpretation, an interpretation that reduces a risk of forfeiture is preferred. Section 227(1) of the Restatement (Second) of Contracts states:

In resolving doubts as to whether an event is made a condition of an obligor's duty, and as to the nature of such an event, an interpretation is preferred that will reduce the obligee's risk of forfeiture, unless the event is within the obligee's control or the circumstances indicate that he has assumed the risk.

The Restatement gives the following example of application of this principle:

2.  A, a mining company, hires B, an engineer, to help reopen one of its mines for "$10,000 to be payable as soon as the mine is in successful operation." $10,000 is a reasonable compensation for B's service. B performs the required services, but the attempt to reopen the mine is unsuccessful and A abandons it. A is under a duty to pay B $10,000 after the passage of a reasonable time.

*Id.* § 227, cmt. b, illus. 2. In this example, it is unclear whether the contract between A and B makes the event—the mine being in successful operation—a condition of A's duty to pay B, or sets the time at which A is required to pay B. In accordance with the principle quoted above, a court should adopt the latter interpretation in order to reduce the risk of B's suffering a forfeiture. *See id.* § 227. We do not believe, however, that this principle is applicable to the operating agreement provisions at issue.

██ 21.  First, we do not believe that a forfeiture would result. If the district court had enforced the non-consent penalty provision, and if Boyd 'X' # 5 turned out to be sufficiently productive, Yates as a non-consenting party would, according to the district court, have earned substantially less than if Yates were a consenting party. However, this loss of expectations does not meet the definition of a forfeiture. The Restatement

uses the term forfeiture to mean the denial of compensation to an obligee because of the non-occurrence of a condition after the obligee has relied substantially on the expectation of the bargained-for exchange, either by preparation or performance. *Id.* § 227 cmt. b. "When it is said that courts do not favor forfeitures, the meaning is that they do not like to see a party to a contract getting something for nothing." 3A Arthur Linton Corbin, *Corbin on Contracts* § 748, at 465 (1960). Our Supreme Court's approach is consistent with this principle; the Court considers the fairness of allowing one party to retain the benefits of the contract if forfeiture is allowed. *See Martinez v. Logsdon,* 104 N.M. 479, 482, 723 P.2d 248, 251 (1986); *Huckins v. Ritter,* 99 N.M. 560, 561–62, 661 P.2d 52, 53–54 (1983); *Albuquerque Nat'l Bank v. Albuquerque Ranch Estates, Inc.,* 99 N.M. 95, 102, 654 P.2d 548, 555 (1982). In the case on appeal, there would be no forfeiture; as a non-consenting party, Yates was not required to do anything, either in preparation or performance.

■ 22. Second, we believe that the principle of interpretation to avoid forfeiture can only be invoked when the resulting interpretation is reasonable in view of the entire contract. We do not, however, believe that, considering the operating agreement as a whole, the district court's interpretation is reasonable. Although the district court is correct that the operating agreement does not expressly state that an election, once made, cannot be changed, it does not follow that the operating agreement is ambiguous on this point or that the district court can read into the operating agreement a provision that is inconsistent with the remainder of the operating agreement. *See Lyon Dev. Co. v. Business Men's Assurance Co. of America,* 76 F.3d 1118, 1124 (10th Cir.1996) (silence on a subject does not create ambiguity); *cf. Continental Potash, Inc. v. Freeport–McMoran, Inc.,* 115 N.M. 690, 704, 858 P.2d 66, 80 (1993) (court cannot imply covenants which are inconsistent with express provisions).

■ 23. A court cannot change contract language for the benefit of one party to the detriment of another. *Smith v. Price's*

*Creameries,* 98 N.M. 541, 545, 650 P.2d 825, 829 (1982); *see Yankee Atomic Elec. Co. v. New Mexico & Ariz. Land Co.,* 632 F.2d 855, 858 (10th Cir.1980). In the absence of ambiguity, a court must interpret and enforce the clear language of the contract and cannot make a new agreement for the parties. *Montoya v. Villa Linda Mall, Ltd.,* 110 N.M. 128, 129, 793 P.2d 258, 259 (1990); *Alvarez v. Southwestern Life Ins. Co.,* 86 N.M. 300, 302, 523 P.2d 544, 546 (1974); *Great W. Oil & Gas Co. v. Mitchell,* 326 P.2d 794, 798 (Okla.1958) (applying this principle to operating agreement).

■ 24. Article VI(B)(1) of the operating agreement expressly states the effect of failure to notify of intent to participate within the thirty day period: "Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation." Our objective in interpreting the contract is to effectuate the intention of the parties; we cannot read additional provisions into the contract unless we determine that it is necessary in order to give effect to the parties' intent. *See Continental Potash, Inc.,* 115 N.M. at 704, 858 P.2d at 80. We see no indication that the parties to the operating agreement intended to allow a change in election after the thirty day notice period.

25. To the contrary, we believe such a provision would be inconsistent with the express provisions of Article VI(B), which establish a detailed time schedule and specific deadlines. *Cf. Continental Potash, Inc.,* 115 N.M. at 704, 858 P.2d at 80 (court cannot imply covenants which are inconsistent with express provisions). Article VI(B)(1) establishes a thirty day period in which a party must give notification of intent to participate in a proposed operation. Article VI(B)(2) requires the proposing party, if not all parties consent, to advise consenting parties "immediately after the expiration of the applicable notice period," and then requires the consenting parties to respond within forty-eight hours.

26. Timely notification is necessary to enable the proposing party to make financial

and other arrangements and still "actually commence work" within sixty days, as required under Article VI(B)(2). If a non-consenting party can change its election after the thirty day period, such a change is likely to affect the arrangements made by the proposing party and yet no additional time is given under the operating agreement in which to "actually commence work."

27. We note that other model form operating agreements include an express provision allowing a party to change from non-consenting to consenting status by giving other parties written notice at any time before actual spudding of the well or commencement of operations. *See* Form 3, Art. 9, § 9.2 (1959) & Form 2, Art. 8, § 8.6 (1955) (published by Rocky Mountain Oil & Gas Ass'n), reprinted in 7 Williams & Meyers, *supra*, §§ 920.5, 920.4. Although model forms are in widespread use, parties to an operating agreement change specific provisions to suit themselves and the particular transaction. *See* 6 Summers, *supra*, § 1328.3, at 502; 7 Eugene Kuntz & Rosamond Miller Kuntz, *A Treatise on the Law of Oil and Gas* § 137.1 (1993); Conine, *Property Provisions, supra*, at 1272. Nearburg and Yates, although they changed other provisions in the model form they used, did not add a provision allowing a change in an election. We believe the trial court erred in reading such a provision into the agreement. *See Petrocana, Inc. v. Margo, Inc.*, 577 So.2d 274, 279 (La.Ct.App.1991) (court will not write new contract to grant relief to mineral lease owner, when party could have negotiated better contract for itself).

28. The district court's interpretation suffers from additional problems. It renders virtually meaningless the provision in Article VI(B)(1) requiring notice within thirty days. In interpreting a contract, the court must consider the contract as a whole and give significance to each part. *See Kirkpatrick*, 114 N.M. at 711, 845 P.2d at 805; *Smith v. Tinley*, 100 N.M. 663, 664, 674 P.2d 1123, 1124 (1984). The district court's interpretation also requires that the deadline for electing to be a consenting or non-consenting party be determined on a case by case basis, thus leading to dispute and litigation rather than the predictability and certainty that parties depend on in contractual relationships. *See State ex rel. Udall v. Colonial Penn Ins. Co.*, 112 N.M. 123, 126, 812 P.2d 777, 780 (1991) (great damage is done if businesses cannot count on certainty in legal relationships). The decision establishes no generally applicable time period in which future elections may be changed.

29. We agree with the trial judge that the purpose of the provisions at issue is "to encourage the parties to the agreement to make an election, in a timely manner, to participate or not." Since the operating agreement provides that an election to participate must be made within thirty days, Yates' letter forty-one days after receipt of notice of the proposed operation was untimely and too late to be effective. We believe that, rather than applying the clear provisions of the contract, the district court's decision constituted rewriting of the contract. It is not reasonable to read into the operating agreement a provision that an election can be changed at any time before the other party has been prejudiced or has substantially relied on the previous election.

## 2. Equitable Relief

30. The district court expressed its decision as contract interpretation allowing Yates to retract its election not to participate because the agreement, if interpreted in any other way, would act as a forfeiture which is disfavored in New Mexico. It appears, however, that the district court invoked its power of equity to provide relief to Yates under the particular circumstances before the court. Section 229 of the Restatement (Second) of Contracts provides:

> To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.

Unlike Section 227 of the Restatement, Section 229 focuses on whether actual forfeiture would occur under the particular circumstances before the court. We have concluded that the non-consent penalty provisions

would not, in general, result in forfeiture. The same reasoning leads us to the same conclusion when we look at the specifics of the dispute: enforcing the non-consent penalty with respect to the Boyd 'X' # 5 operation would not cause Yates to suffer a forfeiture because no preparation or performance was required of Yates with respect to Boyd 'X' # 5. Without a forfeiture, the district court had no basis to use its equity powers to excuse Yates' failure to make a timely election. No other basis for equitable relief has been argued.

 31. Parties to a contract agree to be bound by its provisions and must accept the burdens of the contract along with the benefits. *Russell v. Richards*, 103 N.M. 48, 51, 702 P.2d 993, 996 (1985). When a contract was freely entered into by parties negotiating at arm's length, the duty of the courts is ordinarily to enforce the terms of the contract which the parties made for themselves. *Smith*, 98 N.M. at 545, 650 P.2d at 829. "Although a contract may be declared void where it is unconscionable and oppressive in its terms, nevertheless, the fact that some of the terms of the agreement resulted in a hard bargain or subjected a party to exposure of substantial risk, does not render a contract unconscionable where it was negotiated at arm's length, and absent an affirmative showing of mistake, fraud or illegality." *Id.* (citation omitted). A court should thus not interfere with the bargain reached by the parties unless the court concludes that the policy favoring freedom of contract ought to give way to one of the well-defined equitable exceptions, such as unconscionability, mistake, fraud, or illegality. *See Colonial Penn Ins. Co.*, 112 N.M. at 126, 812 P.2d at 780; *Winrock Inn Co. v. Prudential Ins. Co. of Am.*, 122 N.M. 562, 570, 928 P.2d 947, 955 (Ct.App.), *cert. denied*, 122 N.M. 578, 929 P.2d 269 (1996); *see also Isler v. Texas Oil & Gas Corp.*, 749 F.2d 22, 23 (10th Cir.1984).

32. Since we see nothing in this case to trigger the court's power of equity, the district court abused its discretion in refusing to enforce the non-consent penalty provisions to which the parties had agreed. *See Brooks*, 114 N.M. at 574, 844 P.2d at 824;

*Wolf & Klar Cos.*, 101 N.M. at 118, 679 P.2d at 260; Restatement, *supra*, § 229 cmt. b. Although the decision of whether equitable relief should be granted is within the sound discretion of the trial court, "[s]uch discretion is not a mental discretion to be exercised as one pleases, but is a legal discretion to be exercised in conformity with the law." *Continental Potash, Inc.*, 115 N.M. at 697, 858 P.2d at 73.

## III. CONCLUSION

33. The operating agreement provisions are clear. Failure to elect to participate within thirty days of receiving notice of a proposed operation constitutes an election not to participate. When this condition occurs, the non-consent penalty results. As the non-consent penalty does not constitute a forfeiture, there was nothing to trigger a resort to equity and the trial court abused its discretion in refusing to enforce the non-consent penalty provisions. We reverse the decision of the district court and remand for entry of an order consistent with this opinion.

34. **IT IS SO ORDERED.**

BOSSON and ARMIJO, JJ., concur.

