In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-05-00187-CR
______________________________


TOMMY RAY YOUNG, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 402nd Judicial District Court
Wood County, Texas
Trial Court No. 18,581-2004


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Justice Carter


MEMORANDUM OPINION

            Tommy Ray Young has filed a notice of appeal from an order dismissing the prosecution
against him. Generally, appellate courts may consider an appeal by a criminal defendant only after
conviction. See Workman v. State, 170 Tex. Crim. 621, 622, 343 S.W.2d 446, 447 (1961). There
are narrow exceptions to the rule requiring conviction before a criminal defendant may appeal. 
Wright v. State, 969 S.W.2d 588, 589 (Tex. App.—Dallas 1998, no pet.); McKown v. State, 915
S.W.2d 160, 161 (Tex. App.—Fort Worth 1996, no pet.). 
            Because Young has not been convicted and his case does not fall into any of the exceptions
allowing a criminal defendant to appeal without having been convicted, we conclude we do not have
jurisdiction over this appeal. See Wright, 969 S.W.2d at 589–90 (defendant may not appeal pretrial
order revoking bond); Shumake v. State, 953 S.W.2d 842, 846–47 (Tex. App.—Austin 1997, no pet.)
(defendant may not appeal pretrial order raising bond); McKown, 915 S.W.2d at 161 (defendant may
not appeal trial court's denial of motion to suppress); Petty v. State, 800 S.W.2d 582, 583 (Tex.
App.—Tyler 1990, no pet.) (defendant may not appeal trial court's order of dismissal—not aggrieved
by order).
            We dismiss the appeal for want of jurisdiction.


                                                                        Jack Carter
                                                                        Justice
 
Date Submitted:          January 4, 2006
Date Decided:             January 5, 2006

Do Not Publish



e . . . shall equal the total of the following:


 (a) 100% of each such Non-Consenting Party's share of the cost of any newly
acquired surface equipment . . . plus 100% of each such Non-Consenting Party's
share of the cost of operation of the well commencing with first production and
continuing until each such Non-Consenting Party's relinquished interest shall revert
to it under other provisions of this Article, it being agreed that each Non-Consenting
Party's share of such costs and equipment will be that interest which would have been
chargeable to each Non-Consenting Party had it participated in the well from the
beginning of the operation; and 

 

 (b) 300% of that portion of the costs and expenses of drilling . . .; 300% of that
portion of the cost of newly acquired equipment in the well (to and including the well
head connections), which would have been chargeable to such Non-Consenting Party
if it had participated therein.

A.A.P.L. Form 610-1977 art. VI.B. (1977) (emphasis added).

 The trial court's judgment severed this cause of action, abated the remaining causes, and
concluded that Valence complied with the above provisions regarding subsequent operations and that
the nonconsent penalty is enforceable against Dorsett. On appeal of this judgment, Dorsett contends
the above provisions in the operating agreement establish a chronological process with which
Valence must comply in order to subject her to the nonconsent penalty. This process, she argues,
requires that Valence give her notice of proposed operations thirty days before commencing work. 
Since she did not receive timely notice of the proposals, Dorsett claims, her duty to elect to
participate was never triggered and, thus, her failure to elect could not render her a nonconsenting
party subject to the nonconsent penalty.

 In response, Valence argues that Article VI.B.(1) requires only that an operator give a
nonoperator notice of a proposed operation and then allow a thirty-day election period. Valence
reads this provision to mean that an operator can commence work at any time before or after notice
is given to the nonoperating parties, as long as it allows the parties thirty days to make their election. 
Valence contends that Dorsett's failure to elect to participate within thirty days rendered her a
nonconsenting party and subjected her to the 300% nonconsent penalty.

ANALYSIS

Standard of Review

 We review a summary judgment de novo and will affirm it only if the summary judgment
record establishes the movant's right to summary judgment as a matter of law. Gibbs v. Gen. Motors
Corp., 450 S.W.2d 827, 828 (Tex. 1970). When both parties move for summary judgment, each
party bears the burden of establishing that it is entitled to judgment as a matter of law. See Guynes
v. Galveston County, 861 S.W.2d 861, 862 (Tex. 1993); Am. States Ins. Co. v. Arnold, 930 S.W.2d
196, 200 (Tex. App.-Dallas 1996, writ denied). When both sides file motions for summary
judgment and the trial court grants one motion and denies the other, we consider all the evidence
accompanying both motions to determine whether the trial court should have granted either party's
motion, and, on finding error, we render the judgment the trial court should have rendered. See
Jones v. Strauss, 745 S.W.2d 898, 900 (Tex. 1988) (orig. proceeding); Arnold, 930 S.W.2d at 200. 
If neither movant demonstrates its right to summary judgment as a matter of law, we must remand
the case to the trial court. See Howard v. INA County Mut. Ins. Co., 933 S.W.2d 212, 217 (Tex.
App.-Dallas 1996, writ denied).

Validity and Effect of a Nonconsent Penalty

 Dorsett challenges the validity of the nonconsent penalty as an unenforceable liquidated
damages clause. (2) While the law does not favor such a damages clause, courts will enforce one when
it satisfies a two-pronged test. Rio Grande Valley Sugar Growers, Inc. v. Campesi, 592 S.W.2d 340,
342 n.2 (Tex. 1979); Hamilton v. Tex. Oil & Gas Corp., 648 S.W.2d 316, 321 (Tex. App.-El Paso
1982, writ ref'd n.r.e.). Before a court will enforce a liquidated damages clause, it must find that the
harm caused by the breach is of a nature that makes estimation of damages very difficult or
impossible and that the amount of liquidated damages the provision calls for is a "reasonable forecast
of just compensation." Campesi, 592 S.W.2d at 342.

 Recognizing the nonconsent penalty as a mechanism through which consenting parties are
compensated for assuming the financial risks associated with exploration and development, courts
have held that a nonconsent penalty is valid and enforceable. See Hamilton, 648 S.W.2d at 321;
Nearburg v. Yates Petroleum Corp., 943 P.2d 560, 566 (N.M. Ct. App. 1997). The nonconsent
penalty offers an incentive to a party who takes on the risks of development and a disincentive to a
party who avoids them. See Hamilton, 648 S.W.2d at 321; Nearburg, 943 P.2d at 566. The
uncertainty and substantial risks involved in this arena create an environment in which this provision
should be enforced. See Hamilton, 648 S.W.2d at 321. 

 A 300% nonconsent penalty means the nonconsenting party will relinquish his or her right
to receive his or her share of production revenue until the consenting parties recover three times the
nonconsenting party's share of the expenses. See Abraxas Petroleum Corp. v. Hornburg, 20 S.W.3d
741, 747 (Tex. App.-El Paso 2000, no pet.). If an operator fails to give proper notice of proposed
operations, the nonconsent penalty is not triggered. See El Paso Prod. Co. v. Valence Operating Co.,
No. 01-01-00195-CV, 2003 Tex. App. LEXIS 4980, at *15-16 (Houston [1st Dist.] June 12, 2003,
no pet. h.). Without proper notice, the nonconsent penalty will not apply to the nonoperating party, 
who will, under these circumstances, be able to receive his or her share of the revenues without
penalty as soon as his or her share of the expenses is recouped. See id.

Determining Dates that Valence "Commenced Work"

 Valence has never formally disputed the dates asserted in Dorsett's motion for summary
judgment as the dates it commenced work on the proposed operations. Valence does, however,
respond to the motion with reference to the "spud" dates, the dates that Valence actually first drilled
into the ground at each site. In her calculation of the relevant time periods, Dorsett uses dates, before
the "spud" dates, when Valence performed a more preliminary step toward the actual drilling of the
hole.

 Cases have construed a similar term "commence operations" in drilling clauses of oil and gas
leases in which the lessor will forfeit the lease if the lessor does not commence operations within a
certain prescribed period. In these cases, a general rule emerges that acts preparatory to the actual
drilling are sufficient to constitute commencement of operations and, thus, avoid forfeiture. See,
e.g., Terry v. Tex. Co., 228 S.W. 1019, 1020 (Tex. Civ. App.-Fort Worth 1920, no writ). Valence
argues that an analogy to the construction of the term as used in other oil and gas provisions is
inappropriate. We disagree. Although the drilling clause of an oil and gas lease serves a different
purpose and can have a significantly different impact on the parties to the lease, we will consider
these cases persuasive authority and illustrative of the practice and activities in the oil and gas
industry, especially in light of the fact Valence did not actively contest these dates. (3)

 Various activities preliminary to actual drilling have been held to represent commencement
of operations. To mark commencement of operations, actual drilling is unnecessary. See Petersen
v. Robinson Oil & Gas Co., 356 S.W.2d 217, 220 (Tex. Civ. App.-Houston 1962, no writ). Acts
such as selecting the location of wells, hauling lumber onto the site, erecting derricks, moving
machinery onto the site, and providing a water supply, when performed with the bona fide intention
to proceed thereafter with diligence toward the completion of the well, have been held a
commencement or beginning of a well for drilling operations within the meaning of various leases. 
See id.; Guleke v. Humble Oil & Ref. Co., 126 S.W.2d 38, 41-42 (Tex. Civ. App.-Amarillo 1939,
no writ); Terry, 228 S.W. at 1020; McCallister v. Tex. Co., 223 S.W. 859, 861 (Tex. Civ. App.-Fort
Worth 1920, writ ref'd). But see Forney v. Ward, 62 S.W. 108, 108-09 (Tex. Civ. App.-Houston
1901, no writ) (hauling lumber onto site on last day of lease alone not sufficient to constitute
commencement). The word "commence," according to the court, was defined as "to perform the first
act of." Terry, 228 S.W. at 1020.

 Valence incorrectly refers to the "spud" date to measure the notice and election periods of
the subsequent operations provision. Long before an actual hole was drilled at the site, Valence had
performed the first act toward drilling the well. For example, on November 6, 1999, Valence paid
approximately $1,400.00 to contractors for site preparation and cleanup. Although long before
December 8, 1999, the date actual drilling began, these acts marked the date Valence commenced
work on Well No. 5. Similarly, the dates Dorsett used in reference to the other wells signify the
commencement of work on each well in that, on those days, Valence performed a preliminary and
necessary step toward the completion of the operation.

 We will use the following dates as set forth in the summary judgment record to calculate the
timeliness of the participation notices Valence sent to Dorsett: 

 Commenced Notice CommencedNotice

 Well Work Served Well Work Served

 #2 05.31.96 05.06.96 #6 07.14.00 08.23.00

 #3 07.15.99 08.13.99 #7 07.22.00 08.23.00

 #4 09.30.99 10.04.99 #8 08.10.00 08.23.00

 #5 11.06.99 11.15.99 #9 12.08.01 (4) 12.08.01

Doing so, we see Valence did not give notice to Dorsett at least thirty days before commencing work
on the proposed operations. In fact, in regard to seven of the eight wells at issue, Valence gave
notice of the operations after it had commenced work on the respective well. Again, Valence does
not forcefully argue its position regarding the dates. (5) Instead, it focuses on construction of the
operating agreement in a way to diminish or eliminate the impact of the deadlines and schedule
within the subsequent operations provisions.

Construction of the Operating Agreement

 If an agreement is worded so it can be given a certain or definite legal meaning, then it is not
ambiguous, and the construction of the agreement is a question of law for the court. Wal-Mart
Stores, Inc. v. Sturges, 52 S.W.3d 711, 728-29 (Tex. 2001); Hornburg, 20 S.W.3d at 759. In
construing a contract, we ascertain the objective intent of the parties as expressed in the writing
itself. See Sun Oil Co. v. Madeley, 626 S.W.2d 726, 731 (Tex. 1981). Unless the agreement
specifically indicates that the parties intended a word to carry a different or specialized meaning, we
apply the common and ordinary meaning to words or phrases. San Jacinto Oil Co. v. Fort Worth
Power & Light Co., 41 Tex. Civ. App. 293, 93 S.W. 173, 174 (1906).

 We read the agreement under the presumption the parties intended every clause to have some
effect, that they did not intend any language to be treated as surplusage. See Westwind Exploration,
Inc. v. Homestate Sav. Ass'n, 696 S.W.2d 378, 382 (Tex. 1985); Fed. Deposit Ins. Co. v. K-D
Leasing Co., 743 S.W.2d 774, 776 (Tex. App.-El Paso 1988, no writ). To this end, we examine the
entire instrument, harmonizing and giving effect to all provisions to the extent possible so that no
provision will be rendered meaningless. Universal C.I.T. Credit Corp. v. Daniel, 150 Tex. 513, 243
S.W.2d 154, 157-58 (1951). At the same time, we view an instrument in its entirety so that no single
portion, sentence, or clause, when considered alone, will control. See Myers v. Gulf Coast Minerals
Mgmt. Corp., 361 S.W.2d 193, 196 (Tex. 1962). Courts prefer a reasonable interpretation of an
agreement over one which is unreasonable. See Westwind Exploration, Inc., 696 S.W.2d at 382.

 Although no Texas case directly addresses the specific issue before the Court, some Texas
cases have addressed other aspects of a nonconsent penalty and delineated some applicable
principles. The court in Hamilton validated the nonconsent penalty as an enforceable provision that
appropriately allocates financial risk. Hamilton, 648 S.W.2d at 321. Hamilton also illustrates the
conditions under which imposition of a nonconsent penalty will be sustained and when it will not. 
Id. at 320. The joint operating agreement in Hamilton provided for notice of proposed operations
and election by the parties at two different stages of the operation, the drilling stage and the
completion stage. Id. Since the contract was divisible in this respect, the court analyzed the
imposition of the nonconsent penalty at each stage and found that the penalty assessed at the drilling
stage was improper and the penalty assessed at the completion stage was appropriate. Id.

 TXO's failure to drill at the site specified in the notice rendered the notice to Hamilton
insufficient to trigger his duty to elect to participate in the operation as located at the actual drilling
site. Id. Since Hamilton had no duty to elect to participate in the drilling costs of the operations at
this location, he could not be subjected to the nonconsent penalty. With respect to the completion
costs, however, the court determined Hamilton did have sufficient notice of the operations and the
change of location. Having sufficient notice, Hamilton had a duty to elect to participate in the
completion costs. Id. Failure to elect to participate at this stage meant Hamilton was a
nonconsenting party against whom TXO could assess the nonconsent penalty. Id.

 A very recent case also illustrated the impact of failure to provide proper notice of subsequent
operations. El Paso Prod. Co., 2003 Tex. App. LEXIS 4980, at *15-16. That is, when the operator
failed to give notice, the nonconsent penalty was never triggered, and the nonoperating party was not
subject to the nonconsent penalty. Id. In that case, Valence argued that a breach on the part of the
nonoperating party relieved it of the duty to provide notice of proposed operations. The court
disagreed and concluded Valence improperly assessed the nonconsent penalty. Id. On the other
hand, an operator properly imposed a nonconsent penalty when the operator sent sufficient notice
of its proposal according to the time periods established in the agreement, but a clerical error had
misidentified the well number. Cone v. Fagadau Energy Corp., 68 S.W.3d 147, 163-64 (Tex.
App.-Eastland 2001, pet. denied). Testimony at trial supported the conclusion that the error was not
a misrepresentation by the operator. Id. The court determined the nonconsent penalty was properly
triggered and applied to the facts of that case. Id. at 164.

 While cases from other jurisdictions do not control, we note the factual similarities and sound
reasoning behind some of the cases outside Texas. See Mountain States Natural Gas Corp. v.
Petroleum Corp., 693 F.2d 1015, 1020-21 (10th Cir. 1982); Nearburg, 943 P.2d at 563-64, 567-68. 
Construing the same nonconsent penalty as the one at issue and citing Hamilton, a New Mexico
court provides the Court with persuasive authority explaining how the subsequent operations
provisions create a time line of notice and election to which the parties must adhere. Nearburg, 943
P.2d at 567-70. Yates argued that an election not to participate represented an offer to relinquish the
party's interest and that this offer can be accepted by the proposing party actually commencing work
within the election period. Id. at 566. The Nearburg court rejected Yates' "strained interpretation"
and determined that the express language of Article VI.B. "establish[ed] a detailed time schedule and
specific deadlines" in connection with notice of proposed subsequent operations. Id. at 566, 569. 
The court explained that Yates' argument was inconsistent with the express language of the
agreement allowing thirty days in which a party could make its election. Id. at 566.

 The United States Tenth Circuit Court of Appeals decided a case concerning the timing of
required notice of proposed operations. See Mountain States, 693 F.2d at 1020-21. In Mountain
States, Petco, an independent oil company, petitioned the New Mexico Oil Conservation Division
to issue an order that would force pool Mountain States' forty acre tract into a drilling unit with
Petco's 120-acre tract. Id. at 1017. The Division issued an order that forced Mountain States into
a drilling unit and named Petco as operator. Id. The order included a nonconsent penalty that
provided: "[A]fter the effective date of [the] order and within a minimum of 30 days prior to
commencing [the] well, the operator shall furnish . . . each known working interest owner . . . an
itemized schedule of estimated well costs." Id. The order further provided that nonconsenting
parties were required to pay 200% of the reasonable well costs as "risk charges." Id.

 Petco sent Mountain States a certified letter containing a copy of the Division's order and a
copy of the estimated well costs on October 25. Id. On October 31, without response from
Mountain States, Petco commenced drilling the well. Id. The court found that Petco's attempt to
notify Mountain States did not comply with the terms of the Division order for a number of reasons,
one being that Petco failed to notify Mountain States thirty days before commencing work on the
operation. Id. at 1020. Petco argued it need only give notice within thirty days of commencing
work. Id. at 1021. The court rejected this construction in favor of one applying the plain language
of the order. Id. Accordingly, the court affirmed the trial court's judgment finding that Petco failed
to comply with the agency's order. Id.

 Although the language in the nonconsent penalty in Mountain States varies from the language
at issue here, the case remains valuable in that it illustrates a court's application of the plain meaning
of the contract language and effectuates the objective purpose of notice and election periods with
respect to the timing contemplated by such provisions. We see that courts in Texas and elsewhere
are willing to enforce nonconsent penalties but require moderately strict adherence to the notice
provisions before they will do so.



Parties' Intent: Purpose of Notice and Election Period

 Particularly relevant to the construction of this nonconsent penalty is the purpose of the
election period and the relationship the agreement creates among parties. The election period serves
as an "accounting device," lending certainty and providing information to the operator and the parties
who choose to bear costs in the proposal. See Gary B. Conine, Property Provisions of the Operating
Agreement-Interpretation, Validity, and Enforceability, 19 Tex. Tech. L. Rev. 1263, 1296 (1988)
(hereafter Conine, Property Provisions). Recognizing this consideration, the agreement further
provides that, on learning who will be participating in the project, each consenting party will have
a period of time to elect the extent of his or her interest in the operation. See A.A.P.L. Form 610-1977, art. VI.B.(2). At the end of the thirty-day election period, consenting parties may choose either
to commit to the extent of their original interest or to increase their participation by assuming
responsibility for or "carrying" nonconsenting parties' interests. See id.

 This provision responds to consenting parties' need to know who is participating in this
operation and to what extent they participate. See Conine, Property Provisions, at 1286-87. Based
on that information, the proposing party can even elect to withdraw its proposal altogether. See
A.A.P.L. Form 610-1977, art. VI.B.(2). This arrangement ensures that the parties to the agreement
will have current geographical and financial information regarding the proposed operation and
allows consenting parties to reconsider their positions in the operation and make their decisions and
financial arrangements accordingly. See Conine, Property Provisions, at 1286.

 In order to fully develop this relationship according to express language of the operating
agreement, consenting parties must know who is participating and to what extent before the project
begins. If we were to adopt Valence's construction, then this second election of the consenting
parties would be meaningless, and their obligations would be uncertain. To give meaning and effect
to this post-notice election provision, we must construe the nonconsent penalty to require notice
thirty days in advance of the commencement of proposed operations.

 Further, Valence's construction could allow a party to assess an operation's progress before
making the election regarding participation. Surely, Valence did not intend to place itself at such
a disadvantage by giving nonoperators that power. Doing so would make poor business sense and
undermine the very purpose behind a nonconsent penalty, that is, to reward those who undertake the
risks and costs of further development.

Plain Meaning: "Proposed Operations"

 We must assign meaning to the word "proposed," and that meaning will be the ordinary one. 
See San Jacinto Oil Co., 93 S.W. at 174. The word "proposed" is defined as "planned for the
future." (6) "Proposed operations" does not mean previous operations or current undertakings. (7) The
court should not apply an unreasonable definition of the word, nor should it treat the word as
surplusage. Valence's interpretation means that, in theory, the operator could give notice to the
nonoperators even after the operation had been completed. With respect to seven of the eight wells
at issue, Valence sent Dorsett participation notices (8) after operations had commenced on the proposed
operations, rendering the wells current operations rather than "proposed operations." Here, the plain
meaning of the language indicates the parties' intended notice to be sent before beginning work on
the project proposed.

Harmonization: Commencement Deadline

 Additionally, Valence's interpretation is flawed in that it ignores the deadline for
commencing operations once the election period expires. We must give meaning to this provision
and attempt to harmonize it with the other subsections so that no clause becomes meaningless and
no clause controls. See Universal C.I.T. Credit Corp., 243 S.W.2d at 157-58; Myers, 361 S.W.2d
at 196. In Article VI.B.(2), the operating agreement provides that the operator "must commence
operations within sixty days of the expiration of the thirty days within which a party may elect to
participate." (Emphasis added.)

 Valence's interpretation ignores this clause. In order to give meaning to this subsection, we
interpret the agreement to require that the thirty-day period expire before the sixty-day period begins
in which the operator must commence operations. (9) The agreement designates the beginning and
ending dates of the period in which the operator must begin work on the proposal; clearly, the parties
intended the work to begin within that time period, not before it.

 To read this subsection in any other way is to create inconsistency and confusion within the
agreement. (10) In order for the provisions concerning subsequent operations to be meaningful and
cohesive, the parties must have intended that operations not commence before the expiration of the
thirty-day notice period. Objectively, the parties intended that each clause have a purpose and that
each works in conjunction with other provisions in the agreement. In order to effectuate this intent,
we agree with Dorsett's construction of the notice provisions.

Conclusion

 Valence contends that Article VI.B.(1) requires only that the operator allow the nonoperator
thirty days to elect to participate, regardless of the timing of commencement of operations. 
However, applying the plain meaning of language used and reading the notice provision in the
context of other rights and duties created by the agreement, we find Valence's construction an
unreasonable one as it would render meaningless other portions of the agreement, would allow one
subsection to control, and would operate contrary to both the parties' objective intent and general
business principles. In order to give effect to all the portions of the operating agreement, harmonize
those portions, and effectuate the objective intent of the parties, we must read the contract to require
that the operator provide parties notice of proposed operations and allow thirty days for the parties
to elect to participate before the operator commences work on the operation. The trial court erred
when it rendered summary judgment on this matter in favor of Valence. We sustain Dorsett's point
of error.

 Accordingly, we reverse the trial court's judgment and render summary judgment in favor
of Dorsett that Valence did not comply with the provisions for notice of proposed operations and,
therefore, the nonconsent penalty was never triggered and is not enforceable against Dorsett. We
remand the cause to the trial court for further proceedings consistent with this opinion.


 Josh R. Morriss, III

 Chief Justice


Date Submitted: May 14, 2003

Date Decided: June 13, 2003



1. Such a provision has also been referred to as "bonus penalty," "sole risk clause," "risk
penalty," or "risk charges."
2. We should note that withholding consent to subsequent operations is well within the rights
of a nonoperating party under this and most operating agreements and, therefore, is not a breach of
the agreement. Courts, however, have analyzed the nonconsent penalty within this framework. See
Hamilton v. Tex. Oil & Gas Corp., 648 S.W.2d 316, 321 (Tex. App.-El Paso 1982, writ ref'd n.r.e.).

 

 It is this inconsistency which has caused some courts to criticize the use of the term
"penalty." See Nearburg v. Yates Petroleum Corp., 943 P.2d 560, 566 (N.M. Ct. App. 1997). The
rationale behind the Nearburg position is sound, but, for clarity and convenience, we will refer to
the provision with the commonly-used term "nonconsent penalty."
3. Additionally, we note the semantic distinction between the phrases "commence work on
proposed operations" and "commence operations," the latter implying a more advanced stage of
progress. From this distinction, reason dictates an operator can "commence work on a proposed
operation" with a more preliminary step than would be necessary to qualify for the standard required
to "commence operations."
4. The  record  does  not  establish  an  exact  date  when  Valence  began  work  on  Mobley
Well No. 9. Dorsett contends the date was long before December 8, 2001, but uses that date for the
purpose of her brief and for the sake of convenience. 
5. If Valence were to have challenged the dates set forth by Dorsett, then summary judgment
probably would have been improper. The dates that an operator commences operations usually pose
questions of fact. See Woods v. Bost, 26 S.W.2d 299, 304 (Tex. Civ. App.-Amarillo 1930, writ
dism'd).
6. Princeton University's WordNet 1.6 (1997).
7. It is also worth noting that some operating agreements do provide for "casing point
elections," whereby a nonoperator can elect to participate in the completion of a well after the
drilling has been completed. The existence of a provision concerning operations that have already
been commenced implies that this provision, silent as to current operations, does not.
8. Although the court does not need to look to extrinsic evidence to construe the unambiguous
language of the operating agreement here, Valence's notices support the conclusion that Dorsett's
interpretation reflects the parties' objective intent. In each notice, Valence refers to "immediate
drilling," not current drilling. The plain meaning of "immediate" indicates drilling has not occurred
as yet, but will very soon. 
9. If, after expiration of the thirty-day notice period, the operator fails to commence work
within sixty days, he or she must begin the process again. The operator must give notice of the
proposal, and the thirty-day period in which the nonoperator can elect to participate begins anew. 
10. Although "within sixty days of the expiration" can be read to include a sixty-day period
before the expiration, such a reading is, in this context, nonsensical and could not have been
intended.