Elmagene W. **DORSETT**, Appellant,

v.

**VALENCE OPERATING COMPANY,**
Appellee.

No. 06–02–00141–CV.

Court of Appeals of Texas,
Texarkana.

Submitted May 14, 2003.
Decided June 13, 2003.
Rehearing Overruled Aug. 5, 2003.

Edwin E. Buckner Jr., Law Offices of Edwin E. Buckner, Jr., Marshall, for appellant.

Michael E. Warwick, Ruben K. Abney, Abney & Warwick, Marshall, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Chief Justice MORRISS.

This is an appeal of the partial summary judgment issued by the 71st Judicial District Court in Harrison County on August 8, 2002, and September 23, 2002. The summary judgment raises issues concerning interpretation of a provision in a joint operating agreement that imposes a non-consent penalty[1] on parties to the agreement who do not timely elect to participate in proposed subsequent operations.

## FACTUAL AND PROCEDURAL HISTORY

On September 9, 1981, TXO Production Corporation, as operator, and Elmagene W. Dorsett (hereafter "Dorsett"), as a 4.05391% working interest owner, executed a joint operating agreement covering the Mobley No. 1 Gas Unit composed of 677.04606 acres in Harrison County. This operating agreement followed the commonly-used 1977 Model Form 610 promulgated by the American Association of Professional Landmen. TXO drilled and completed the Mobley Well No. 1 as a commercially producing well. Dorsett participated as a working interest owner and paid her share of drilling and completion costs of this initial test well. In 1994, Marathon Oil Company, successor to TXO, and Amoco Production assigned to Valence Operating Company of Kingwood (hereafter "Valence") their interests in the unit, giving Valence a 94.28446% working

1. Such a provision has also been referred to as "bonus penalty," "sole risk clause," "risk penalty," or "risk charges."

interest, and Valence assumed operation of the Mobley No. 1 Gas Unit.

As operator, Valence proposed exploration and development of subsequent operations. Such proposals are specifically covered by the operating agreement. The pertinent sections of the operating agreement are as follows:

1. *Proposed Operations:* Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A. [the initial test well], ... the party desiring to drill, complete, rework, deepen, or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. *The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation.... Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation....*

2. *Operations by Less than All Parties:* If any party receiving such notice ... elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this article, *the party or parties giving the notice* and such other parties as shall elect to participate ... *shall, within sixty (60) days after the expiration of the notice period of thirty (30) days ... actually commence work on the proposed operation and complete it with due diligence....*

If less than all parties approve any proposed operation, *the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of (a) the total interest of the parties approving such operation, and (b) its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday or legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non–Consenting Parties' interest.* The proposing party, at its election, may withdraw such proposal if there is insufficient participation, and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph.... If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well at their sole cost, risk and expense. If any well drilled, completed, reworked, deepened, or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non–Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non–Consenting

[Parties'] interest in the well and share of production therefrom until the proceeds of the sale of such share ... shall equal the total of the following:

(a) 100% of each such Non–Consenting Party's share of the cost of any newly acquired surface equipment ... plus 100% of each such Non–Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non–Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non–Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non–Consenting Party had it participated in the well from the beginning of the operation; and

(b) 300% of that portion of the costs and expenses of drilling ...; 300% of that portion of the cost of newly acquired equipment in the well (to and including the well head connections), which would have been chargeable to such Non–Consenting Party if it had participated therein.

A.A.P.L. Form 610–1977 art. VI.B. (1977) (emphasis added).

The trial court's judgment severed this cause of action, abated the remaining causes, and concluded that Valence complied with the above provisions regarding subsequent operations and that the nonconsent penalty is enforceable against Dorsett. On appeal of this judgment, Dorsett contends the above provisions in the operating agreement establish a chronological process with which Valence must comply in order to subject her to the nonconsent penalty. This process, she argues, requires that Valence give her notice of proposed operations thirty days before commencing work. Since she did not receive timely notice of the proposals, Dorsett claims, her duty to elect to participate was never triggered and, thus, her failure to elect could not render her a nonconsenting party subject to the nonconsent penalty.

In response, Valence argues that Article VI.B.(1) requires only that an operator give a nonoperator notice of a proposed operation and then allow a thirty-day election period. Valence reads this provision to mean that an operator can commence work at any time before or after notice is given to the nonoperating parties, as long as it allows the parties thirty days to make their election. Valence contends that Dorsett's failure to elect to participate within thirty days rendered her a nonconsenting party and subjected her to the 300% nonconsent penalty.

ANALYSIS

*Standard of Review*

We review a summary judgment de novo and will affirm it only if the summary judgment record establishes the movant's right to summary judgment as a matter of law. *Gibbs v. Gen. Motors Corp.*, 450 S.W.2d 827, 828 (Tex.1970). When both parties move for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *See Guynes v. Galveston County*, 861 S.W.2d 861, 862 (Tex.1993); *Am. States Ins. Co. v. Arnold*, 930 S.W.2d 196, 200 (Tex.App.-Dallas 1996, writ denied). When both sides file motions for summary judgment and the trial court grants one motion and denies the other, we consider all the evidence accompanying both motions to determine whether the trial court should have granted either party's motion, and, on finding error, we render the judgment the trial court should have rendered. *See Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex.1988) (orig.proceeding); *Arnold*, 930 S.W.2d at 200. If neither movant demonstrates its right to summary judgment as a matter of law, we must remand the case to

the trial court. *See Howard v. INA County Mut. Ins. Co.*, 933 S.W.2d 212, 217 (Tex.App.-Dallas 1996, writ denied).

*Validity and Effect of a Nonconsent Penalty*

Dorsett challenges the validity of the nonconsent penalty as an unenforceable liquidated damages clause.[2] While the law does not favor such a damages clause, courts will enforce one when it satisfies a two-pronged test. *Rio Grande Valley Sugar Growers, Inc. v. Campesi*, 592 S.W.2d 340, 342 n. 2 (Tex.1979); *Hamilton v. Tex. Oil & Gas Corp.*, 648 S.W.2d 316, 321 (Tex.App.-El Paso 1982, writ ref'd n.r.e.). Before a court will enforce a liquidated damages clause, it must find that the harm caused by the breach is of a nature that makes estimation of damages very difficult or impossible and that the amount of liquidated damages the provision calls for is a "reasonable forecast of just compensation." *Campesi*, 592 S.W.2d at 342.

Recognizing the nonconsent penalty as a mechanism through which consenting parties are compensated for assuming the financial risks associated with exploration and development, courts have held that a nonconsent penalty is valid and enforceable. *See Hamilton*, 648 S.W.2d at 321; *Nearburg v. Yates Petroleum Corp.*, 123 N.M. 526, 943 P.2d 560, 566 (App. 1997). The nonconsent penalty offers an incentive to a party who takes on the risks of development and a disincentive to a party who avoids them. *See Hamilton*, 648 S.W.2d at 321; *Nearburg*, 943 P.2d at 566. The uncertainty and substantial risks

involved in this arena create an environment in which this provision should be enforced. *See Hamilton*, 648 S.W.2d at 321.

A 300% nonconsent penalty means the nonconsenting party will relinquish his or her right to receive his or her share of production revenue until the consenting parties recover three times the nonconsenting party's share of the expenses. *See Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 747 (Tex.App.-El Paso 2000, no pet.). If an operator fails to give proper notice of proposed operations, the nonconsent penalty is not triggered. *See El Paso Prod. Co. v. Valence Operating Co.*, —— S.W.3d ——, ——, No. 01–01–00195–CV, 2003 WL 21357287, at *6-7, 2003 Tex.App. LEXIS 4980, at *15-16 (Houston [1st Dist.] Jun. 12, 2003, no pet. h.). Without proper notice, the nonconsent penalty will not apply to the nonoperating party, who will, under these circumstances, be able to receive his or her share of the revenues without penalty as soon as his or her share of the expenses is recouped. *See id.*

*Determining Dates that Valence "Commenced Work"*

Valence has never formally disputed the dates asserted in Dorsett's motion for summary judgment as the dates it commenced work on the proposed operations. Valence does, however, respond to the motion with reference to the "spud" dates, the dates that Valence actually first

---

**2.** We should note that withholding consent to subsequent operations is well within the rights of a nonoperating party under this and most operating agreements and, therefore, is not a breach of the agreement. Courts, however, have analyzed the nonconsent penalty within this framework. *See Hamilton v. Tex. Oil & Gas Corp.*, 648 S.W.2d 316, 321 (Tex. App.-El Paso 1982, writ ref'd n.r.e.).

It is this inconsistency which has caused some courts to criticize the use of the term "penalty." *See Nearburg v. Yates Petroleum Corp.*, 123 N.M. 526, 943 P.2d 560, 566 (App. 1997). The rationale behind the *Nearburg* position is sound, but, for clarity and convenience, we will refer to the provision with the commonly-used term "nonconsent penalty."

drilled into the ground at each site. In her calculation of the relevant time periods, Dorsett uses dates, before the "spud" dates, when Valence performed a more preliminary step toward the actual drilling of the hole.

Cases have construed a similar term "commence operations" in drilling clauses of oil and gas leases in which the lessor will forfeit the lease if the lessor does not commence operations within a certain prescribed period. In these cases, a general rule emerges that acts preparatory to the actual drilling are sufficient to constitute commencement of operations and, thus, avoid forfeiture. *See, e.g., Terry v. Tex. Co.,* 228 S.W. 1019, 1020 (Tex.Civ. App.-Fort Worth 1920, no writ). Valence argues that an analogy to the construction of the term as used in other oil and gas provisions is inappropriate. We disagree. Although the drilling clause of an oil and gas lease serves a different purpose and can have a significantly different impact on the parties to the lease, we will consider these cases persuasive authority and illustrative of the practice and activities in the oil and gas industry, especially in light of the fact Valence did not actively contest these dates.[3]

Various activities preliminary to actual drilling have been held to represent commencement of operations. To mark commencement of operations, actual drilling is unnecessary. *See Petersen v. Robinson Oil & Gas Co.,* 356 S.W.2d 217, 220 (Tex. Civ.App.-Houston 1962, no writ). Acts such as selecting the location of wells, hauling lumber onto the site, erecting derricks, moving machinery onto the site, and providing a water supply, when performed with the bona fide intention to proceed thereafter with diligence toward the completion of the well, have been held a commencement or beginning of a well for drilling operations within the meaning of various leases. *See id.; Guleke v. Humble Oil & Ref. Co.,* 126 S.W.2d 38, 41–42 (Tex. Civ.App.-Amarillo 1939, no writ); *Terry,* 228 S.W. at 1020; *McCallister v. Tex. Co.,* 223 S.W. 859, 861 (Tex.Civ.App.-Fort Worth 1920, writ ref'd). *But see Forney v. Ward,* 25 Tex.Civ.App. 443, 62 S.W. 108, 108–09 (Houston 1901, no writ) (hauling lumber onto site on last day of lease alone not sufficient to constitute commencement). The word "commence," according to the court, was defined as "to perform the first act of." *Terry,* 228 S.W. at 1020.

Valence incorrectly refers to the "spud" date to measure the notice and election periods of the subsequent operations provision. Long before an actual hole was drilled at the site, Valence had performed the first act toward drilling the well. For example, on November 6, 1999, Valence paid approximately $1,400.00 to contractors for site preparation and cleanup. Although long before December 8, 1999, the date actual drilling began, these acts marked the date Valence commenced work on Well No. 5. Similarly, the dates Dorsett used in reference to the other wells signify the commencement of work on each well in that, on those days, Valence performed a preliminary and necessary step toward the completion of the operation.

We will use the following dates as set forth in the summary judgment record to calculate the timeliness of the participation notices Valence sent to Dorsett:

---

3. Additionally, we note the semantic distinction between the phrases "commence work on proposed operations" and "commence operations," the latter implying a more advanced stage of progress. From this distinction, reason dictates an operator can "commence work on a proposed operation" with a more preliminary step than would be necessary to qualify for the standard required to "commence operations."

| Well | Commenced Work | Notice Served | Well | Commenced Work | Notice Served |
|---|---|---|---|---|---|
| # 2 | 05.31.96 | 05.06.96 | # 6 | 07.14.00 | 08.23.00 |
| # 3 | 07.15.99 | 08.13.99 | # 7 | 07.22.00 | 08.23.00 |
| # 4 | 09.30.99 | 10.04.99 | # 8 | 08.10.00 | 08.23.00 |
| # 5 | 11.06.99 | 11.15.99 | # 9 | 12.08.01 [4] | 12.08.01 |

Doing so, we see Valence did not give notice to Dorsett at least thirty days before commencing work on the proposed operations. In fact, in regard to seven of the eight wells at issue, Valence gave notice of the operations *after* it had commenced work on the respective well. Again, Valence does not forcefully argue its position regarding the dates.[5] Instead, it focuses on construction of the operating agreement in a way to diminish or eliminate the impact of the deadlines and schedule within the subsequent operations provisions.

*Construction of the Operating Agreement*

If an agreement is worded so it can be given a certain or definite legal meaning, then it is not ambiguous, and the construction of the agreement is a question of law for the court. *Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 728–29 (Tex.2001); *Hornburg,* 20 S.W.3d at 759. In construing a contract, we ascertain the objective intent of the parties as expressed in the writing itself. *See Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981). Unless the agreement specifically indicates that the parties intended a word to carry a different or specialized meaning, we apply the common and ordinary meaning to words or phrases. *San Jacinto Oil Co. v. Fort Worth Power & Light Co.,* 41 Tex. Civ.App. 293, 93 S.W. 173, 174 (1906).

We read the agreement under the presumption the parties intended every clause to have some effect, that they did not intend any language to be treated as surplusage. *See Westwind Exploration, Inc. v. Homestate Sav. Ass'n,* 696 S.W.2d 378, 382 (Tex.1985); *Fed. Deposit Ins. Co. v. K–D Leasing Co.,* 743 S.W.2d 774, 776 (Tex.App.-El Paso 1988, no writ). To this end, we examine the entire instrument, harmonizing and giving effect to all provisions to the extent possible so that no provision will be rendered meaningless. *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157–58 (1951). At the same time, we view an instrument in its entirety so that no single portion, sentence, or clause, when considered alone, will control. *See Myers v. Gulf Coast Minerals Mgmt. Corp.,* 361 S.W.2d 193, 196 (Tex.1962). Courts prefer a reasonable interpretation of an agreement over one which is unreasonable. *See Westwind Exploration, Inc.,* 696 S.W.2d at 382.

Although no Texas case directly addresses the specific issue before the Court, some Texas cases have addressed other aspects of a nonconsent penalty and delineated some applicable principles. The court in *Hamilton* validated the nonconsent penalty as an enforceable provision that appropriately allocates financial risk. *Hamilton,* 648 S.W.2d at 321. *Hamilton* also illustrates the conditions under which imposition of a nonconsent penalty will be

---

4. The record does not establish an exact date when Valence began work on Mobley Well No. 9. Dorsett contends the date was long before December 8, 2001, but uses that date for the purpose of her brief and for the sake of convenience.

5. If Valence were to have challenged the dates set forth by Dorsett, then summary judgment probably would have been improper. The dates that an operator commences operations usually pose questions of fact. *See Woods v. Bost,* 26 S.W.2d 299, 304 (Tex.Civ. App.-Amarillo 1930, writ dism'd).

sustained and when it will not. *Id.* at 320. The joint operating agreement in *Hamilton* provided for notice of proposed operations and election by the parties at two different stages of the operation, the drilling stage and the completion stage. *Id.* Since the contract was divisible in this respect, the court analyzed the imposition of the nonconsent penalty at each stage and found that the penalty assessed at the drilling stage was improper and the penalty assessed at the completion stage was appropriate. *Id.*

TXO's failure to drill at the site specified in the notice rendered the notice to Hamilton insufficient to trigger his duty to elect to participate in the operation as located at the actual drilling site. *Id.* Since Hamilton had no duty to elect to participate in the drilling costs of the operations at this location, he could not be subjected to the nonconsent penalty. With respect to the completion costs, however, the court determined Hamilton did have sufficient notice of the operations and the change of location. Having sufficient notice, Hamilton had a duty to elect to participate in the completion costs. *Id.* Failure to elect to participate at this stage meant Hamilton was a nonconsenting party against whom TXO could assess the nonconsent penalty. *Id.*

A very recent case also illustrated the impact of failure to provide proper notice of subsequent operations. *El Paso Prod. Co.*, 2003 WL 21357287, at *6-7, 2003 Tex. App. LEXIS 4980, at *15–16. That is, when the operator failed to give notice, the nonconsent penalty was never triggered, and the nonoperating party was not subject to the nonconsent penalty. *Id.* In that case, Valence argued that a breach on the part of the nonoperating party relieved it of the duty to provide notice of proposed operations. The court disagreed and concluded Valence improperly assessed the

nonconsent penalty. *Id.* On the other hand, an operator properly imposed a nonconsent penalty when the operator sent sufficient notice of its proposal according to the time periods established in the agreement, but a clerical error had misidentified the well number. *Cone v. Fagadau Energy Corp.*, 68 S.W.3d 147, 163–64 (Tex.App.-Eastland 2001, pet. denied). Testimony at trial supported the conclusion that the error was not a misrepresentation by the operator. *Id.* The court determined the nonconsent penalty was properly triggered and applied to the facts of that case. *Id.* at 164.

While cases from other jurisdictions do not control, we note the factual similarities and sound reasoning behind some of the cases outside Texas. *See Mountain States Natural Gas Corp. v. Petroleum Corp.*, 693 F.2d 1015, 1020–21 (10th Cir.1982); *Nearburg*, 943 P.2d at 563–64, 567–68. Construing the same nonconsent penalty as the one at issue and citing *Hamilton*, a New Mexico court provides the Court with persuasive authority explaining how the subsequent operations provisions create a time line of notice and election to which the parties must adhere. *Nearburg*, 943 P.2d at 567–70. Yates argued that an election not to participate represented an offer to relinquish the party's interest and that this offer can be accepted by the proposing party actually commencing work within the election period. *Id.* at 566. The *Nearburg* court rejected Yates' "strained interpretation" and determined that the express language of Article VI.B. "establish[ed] a detailed time schedule and specific deadlines" in connection with notice of proposed subsequent operations. *Id.* at 566, 569. The court explained that Yates' argument was inconsistent with the express language of the agreement allowing thirty days in which a party could make its election. *Id.* at 566.

The United States Tenth Circuit Court of Appeals decided a case concerning the timing of required notice of proposed operations. *See Mountain States*, 693 F.2d at 1020–21. In *Mountain States*, Petco, an independent oil company, petitioned the New Mexico Oil Conservation Division to issue an order that would force pool Mountain States' forty acre tract into a drilling unit with Petco's 120–acre tract. *Id.* at 1017. The Division issued an order that forced Mountain States into a drilling unit and named Petco as operator. *Id.* The order included a nonconsent penalty that provided: "[A]fter the effective date of [the] order and within a minimum of 30 days prior to commencing [the] well, the operator shall furnish ... each known working interest owner ... an itemized schedule of estimated well costs." *Id.* The order further provided that nonconsenting parties were required to pay 200% of the reasonable well costs as "risk charges." *Id.*

Petco sent Mountain States a certified letter containing a copy of the Division's order and a copy of the estimated well costs on October 25. *Id.* On October 31, without response from Mountain States, Petco commenced drilling the well. *Id.* The court found that Petco's attempt to notify Mountain States did not comply with the terms of the Division order for a number of reasons, one being that Petco failed to notify Mountain States thirty days before commencing work on the operation. *Id.* at 1020. Petco argued it need only give notice *within* thirty days of commencing work. *Id.* at 1021. The court rejected this construction in favor of one applying the plain language of the order. *Id.* Accordingly, the court affirmed the trial court's judgment finding that Petco failed to comply with the agency's order. *Id.*

Although the language in the nonconsent penalty in *Mountain States* varies from the language at issue here, the case remains valuable in that it illustrates a court's application of the plain meaning of the contract language and effectuates the objective purpose of notice and election periods with respect to the timing contemplated by such provisions. We see that courts in Texas and elsewhere are willing to enforce nonconsent penalties but require moderately strict adherence to the notice provisions before they will do so.

*Parties' Intent: Purpose of Notice and Election Period*

Particularly relevant to the construction of this nonconsent penalty is the purpose of the election period and the relationship the agreement creates among parties. The election period serves as an "accounting device," lending certainty and providing information to the operator and the parties who choose to bear costs in the proposal. *See* Gary B. Conine, *Property Provisions of the Operating Agreement—Interpretation, Validity, and Enforceability*, 19 TEX. TECH. L.REV. 1263, 1296 (1988) (hereafter Conine, *Property Provisions* ). Recognizing this consideration, the agreement further provides that, on learning who will be participating in the project, each consenting party will have a period of time to elect the extent of his or her interest in the operation. *See* A.A.P.L. Form 610–1977, art. VI.B.(2). At the end of the thirty-day election period, consenting parties may choose either to commit to the extent of their original interest or to increase their participation by assuming responsibility for or "carrying" nonconsenting parties' interests. *See id.*

This provision responds to consenting parties' need to know who is participating in this operation and to what extent they participate. *See* Conine, *Property Provisions*, at 1286–87. Based on that informa-

tion, the proposing party can even elect to withdraw its proposal altogether. *See* A.A.P.L. Form 610–1977, art. VI.B.(2). This arrangement ensures that the parties to the agreement will have current geographical and financial information regarding the proposed operation and allows consenting parties to reconsider their positions in the operation and make their decisions and financial arrangements accordingly. *See* Conine, *Property Provisions,* at 1286.

In order to fully develop this relationship according to express language of the operating agreement, consenting parties must know who is participating and to what extent *before* the project begins. If we were to adopt Valence's construction, then this second election of the consenting parties would be meaningless, and their obligations would be uncertain. To give meaning and effect to this post-notice election provision, we must construe the nonconsent penalty to require notice thirty days in advance of the commencement of proposed operations.

Further, Valence's construction could allow a party to assess an operation's progress before making the election regarding participation. Surely, Valence did not intend to place itself at such a disadvantage by giving nonoperators that power. Doing so would make poor business sense and undermine the very purpose behind a nonconsent penalty, that is, to reward those who undertake the risks and costs of further development.

*Plain Meaning: "Proposed Operations"*

 We must assign meaning to the word "proposed," and that meaning will be the ordinary one. *See San Jacinto Oil Co.,* 93 S.W. at 174. The word "proposed" is defined as "planned for the future." [6] "Proposed operations" does not mean previous operations or current undertakings.[7] The court should not apply an unreasonable definition of the word, nor should it treat the word as surplusage. Valence's interpretation means that, in theory, the operator could give notice to the nonoperators even after the operation had been completed. With respect to seven of the eight wells at issue, Valence sent Dorsett participation notices [8] *after* operations had commenced on the proposed operations, rendering the wells current operations rather than "proposed operations." Here, the plain meaning of the language indicates the parties' intended notice to be sent before beginning work on the project proposed.

*Harmonization: Commencement Deadline*

 Additionally, Valence's interpretation is flawed in that it ignores the deadline for commencing operations once the election period expires. We must give meaning to this provision and attempt to harmonize it with the other subsections so that no clause becomes meaningless and

---

6. Princeton University's WordNet 1.6 (1997).

7. It is also worth noting that some operating agreements do provide for "casing point elections," whereby a nonoperator can elect to participate in the completion of a well after the drilling has been completed. The existence of a provision concerning operations that have already been commenced implies that this provision, silent as to current operations, does not.

8. Although the court does not need to look to extrinsic evidence to construe the unambiguous language of the operating agreement here, Valence's notices support the conclusion that Dorsett's interpretation reflects the parties' objective intent. In each notice, Valence refers to "immediate drilling," not current drilling. The plain meaning of "immediate" indicates drilling has not occurred as yet, but will very soon.

no clause controls. *See Universal C.I.T. Credit Corp.*, 243 S.W.2d at 157–58; *Myers*, 361 S.W.2d at 196. In Article VI. B.(2), the operating agreement provides that the operator "must commence operations within sixty days *of the expiration of the thirty days within which a party may elect to participate*." (Emphasis added.)

Valence's interpretation ignores this clause. In order to give meaning to this subsection, we interpret the agreement to require that the thirty-day period expire before the sixty-day period begins in which the operator must commence operations.[9] The agreement designates the beginning and ending dates of the period in which the operator must begin work on the proposal; clearly, the parties intended the work to begin within that time period, not before it.

To read this subsection in any other way is to create inconsistency and confusion within the agreement.[10] In order for the provisions concerning subsequent operations to be meaningful and cohesive, the parties must have intended that operations not commence before the expiration of the thirty-day notice period. Objectively, the parties intended that each clause have a purpose and that each works in conjunction with other provisions in the agreement. In order to effectuate this intent, we agree with Dorsett's construction of the notice provisions.

*Conclusion*

Valence contends that Article VI.B.(1) requires only that the operator allow the nonoperator thirty days to elect to participate, regardless of the timing of commencement of operations. However, applying the plain meaning of language used and reading the notice provision in the context of other rights and duties created by the agreement, we find Valence's construction an unreasonable one as it would render meaningless other portions of the agreement, would allow one subsection to control, and would operate contrary to both the parties' objective intent and general business principles. In order to give effect to all the portions of the operating agreement, harmonize those portions, and effectuate the objective intent of the parties, we must read the contract to require that the operator provide parties notice of proposed operations and allow thirty days for the parties to elect to participate before the operator commences work on the operation. The trial court erred when it rendered summary judgment on this matter in favor of Valence. We sustain Dorsett's point of error.

Accordingly, we reverse the trial court's judgment and render summary judgment in favor of Dorsett that Valence did not comply with the provisions for notice of proposed operations and, therefore, the nonconsent penalty was never triggered and is not enforceable against Dorsett. We remand the cause to the trial court for further proceedings consistent with this opinion.

---

9. If, after expiration of the thirty-day notice period, the operator fails to commence work within sixty days, he or she must begin the process again. The operator must give notice of the proposal, and the thirty-day period in which the nonoperator can elect to participate begins anew.

10. Although "within sixty days *of* the expiration" can be read to include a sixty-day period *before* the expiration, such a reading is, in this context, nonsensical and could not have been intended.