IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF 
TEXAS
 
════════════
No. 
03-0836
════════════
 
Valence 
Operating Company, Petitioner,
 
v.
 
Elmagene 
W. Dorsett, Respondent
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the 
Sixth District of Texas
════════════════════════════════════════════════════
 
 
Argued September 29, 2004
 
 
Justice Wainwright delivered the 
opinion of the Court.
Justice Brister delivered a concurring 
opinion.
Justice Johnson did not participate in 
the decision.
In 
this case we construe the meaning of certain notice provisions of a commonly 
used oil and gas operating agreement. Working interest owner Elmagene Dorsett sued Valence Operating Company in a dispute 
arising from a joint operating agreement. The trial court granted partial 
summary judgment against Dorsett on her breach of contract claims, finding that 
Dorsett failed to consent to participate in the wells at issue, and that a 
contractual non-consent penalty for that failure was enforceable against her. 
The court of appeals reversed and rendered judgment in favor of Dorsett, holding 
that Valence breached contract provisions that required Valence to give notice 
to Dorsett before commencing drilling operations. 111 S.W.3d 224. The 
determinative issue before us is whether the agreement requires a thirty-day 
notice period to expire before the operator can commence work on the proposed 
operations. Because the non-consent penalty is enforceable and because we find 
nothing in the agreement prohibiting Valence from commencing work on the 
proposed operations before the expiration of the notice period, we reverse the 
court of appeals and render judgment in favor of Valence.
I. Factual and Procedural Background
Elmagene Dorsett is a 4.05391 percent working interest owner 
in 677.04666 
acres in the Mobley Gas Unit in 
Harrison 
County, Texas. In 1981, Dorsett, with 
three other minority working interest owners, and TXO Production Corporation, as 
operator and majority working interest owner, executed a modified 1977 American 
Association of Petroleum Landmen Form 610 Model Form 
Operating Agreement.[1] 
The Model Form Agreement is a contract between oil and gas lease owners and 
interest holders for the exploration and development of designated oil and gas 
within the geographical area described in the Agreement. A.A.P.L. Form 
610-1977, 
preamble (1977). The Model Form Agreement designates a single party as 
“operator” who is responsible for the management and control of drilling, 
development, and production activities. 
Id. preamble, art. V., 
VI.A., C. All other parties are designated “non-operators.” 
Id. preamble. The parties 
to the Agreement have the option on each project to share operating costs and 
liabilities, to own equipment, and, if exercised, to then benefit by sharing in 
production revenues in proportion to their respective percentages of ownership. 
In such cases, these participants are called “consenting parties.” 
Id. art. I.G., VI.B. 
Parties who elect not to participate in a proposed operation, called 
“non-consenting parties,” are subject to a “non-consent penalty” which operates 
as a temporary relinquishment of the interest owner’s share of production 
revenue from the project to the consenting parties.[2] 
Id. art. I.H., VI.B. After 
the consenting parties recoup their investment costs and receive a limited 
return on their investments, the non-consenting parties share in production 
revenues in proportion to their ownership interests. 
Id.
The 
relevant portion of the Model Form Agreement is Article VI.B. on Subsequent 
Operations:
 
1. 
Proposed Operations: Should any party hereto desire to drill any well on 
the Contract Area . . . , the party desiring to drill . . . shall give the other 
parties written notice of the proposed operation, specifying the work to be 
performed, the location, proposed depth, objective formation and the estimated 
cost of the operation. The parties receiving such a notice shall have thirty 
(30) days after receipt of the notice within which to notify the parties wishing 
to do the work whether they elect to participate in the cost of the proposed 
operation . . . . Failure of a party receiving such notice to reply within the 
period above fixed shall constitute an election by that party not to participate 
in the cost of the proposed operation. Any notice or response given by telephone 
shall be promptly confirmed in writing.
 
2. 
Operations by Less than All Parties: If any party receiving such notice 
as provided in Article VI.B.1. or VI.E.1. elects not to participate in the 
proposed operation, then, in order to be entitled to the benefits of this 
article, the party or parties giving the notice and such other parties as shall 
elect to participate in the operation shall, within sixty (60) days after the 
expiration of the notice period of thirty (30) days . . . actually commence work 
on the proposed operation and complete it with due diligence. . . .
 
. 
. . .
 
. 
. . Upon commencement of operations for the drilling, completing, reworking, 
deepening or plugging back of any such well by Consenting Parties in accordance 
with the provisions of this Article, each Non-Consenting Party shall be deemed 
to have relinquished to Consenting Parties, and the Consenting Parties shall own 
and be entitled to receive, in proportion to their respective interests, all of 
such Non-Consenting Party’s interest in the well and share of production therefrom until the proceeds of the sale of such share, 
calculated at the well, or market value thereof if such share is not sold (after 
deducting production taxes, royalty, overriding royalty and other interests 
existing on the effective date hereof, payable out of or measured by the 
production from such well accruing with respect to such interest until it 
reverts) shall equal the total of the following:
 
(a) 
100% of each such Non-Consenting Party’s share of the cost of any newly acquired 
surface equipment beyond the wellhead connections (including, but not limited 
to, stock tanks, separators, treaters, pumping 
equipment and piping), plus 100% of each such Non-Consenting Party’s share of 
the cost of operation of the well commencing with first production and 
continuing until each such Non-Consenting Party’s relinquished interest shall 
revert to it under other provisions of this Article, it being agreed that each 
Non-Consenting Party’s share of such costs and equipment will be that interest 
which would have been chargeable to each Non-Consenting Party had it 
participated in the well from the beginning of the operation; and
 
(b) 
300% of that portion of the costs and expenses of drilling reworking, deepening, 
or plugging back, testing and completing, after deducting any cash contributions 
received under Article VIII.C., and 300% of that portion of the cost of newly 
acquired equipment in the well (to and including the wellhead connections), 
which would have been chargeable to such Non-Consenting Party if it had 
participated therein.
 
. 
. . .
 
If 
and when the Consenting Parties recover from a Non-Consenting Party’s 
relinquished interest the amounts provided for above, the relinquished interests 
of such Non-Consenting Party shall automatically revert to it, and, from and 
after such reversion, such Non-Consenting Party shall own the same interest in 
such well, the material and equipment in or pertaining thereto, and the 
production therefrom as such Non-Consenting Party 
would have been entitled to had it participated in the drilling, completing 
reworking, deepening or plugging back of said well. Thereafter, such 
Non-Consenting Party shall be charged with and shall pay its proportionate part 
of the further costs of the operation of said well in accordance with the terms 
of this agreement and the Accounting Procedure, attached hereto.
 
A.A.P.L. 
Form 610-1977, 
art. VI.B. (1977).
In 
1981, TXO drilled the initial test well, Mobley Well No. 1. In 1994, Valence 
acquired ownership of 94.28446 percent of the working interest in the unit from 
Marathon Oil Company (successor to TXO) and became unit operator. From 1996 to 
2001, Valence drilled eight more gas wells in the unit. Valence provided Dorsett 
with written notice of its intent to drill each of the eight wells, as required 
by the Model Form Agreement, but in each case began preparatory work, and in 
some cases drilling, before thirty days had elapsed after Dorsett’s receipt of 
the notice. Dorsett received the notices but did not consent to and did not 
contribute to any of the costs incurred in drilling the wells. Valence then 
imposed on Dorsett the non-consent penalty described in the Model Form 
Agreement.
Dorsett 
disputed the imposition of the non-consent penalty. Specifically, Dorsett 
contended that the Model Form Agreement required Valence to allow the thirty-day 
notice period to elapse before commencing work on proposed operations. She 
argued that Valence’s failure to do so constituted a breach of contract, thereby 
preventing enforcement of the non-consent penalty. She also contended that the 
non-consent penalty was an unenforceable liquidated damages provision. In 2000, 
Dorsett sued Valence for breach of contract, specific performance, and 
conversion. She asserted causes of action for damage to the surface of her land 
stemming from Valence’s failure to accommodate surface use and negligence; she 
also requested a declaratory judgment of her rights under the Agreement and a 
full accounting.
The 
parties filed cross-motions for partial summary judgment. Dorsett moved for 
partial summary judgment on the breach of contract, accounting, and declaratory 
judgment claims and requested severance of her surface damage claims. Valence 
moved for partial summary judgment on the contract claims as well. The trial 
court granted Valence’s motion for partial summary judgment on the breach of 
contract claims, finding that Dorsett failed to elect to participate in the 
eight wells and that the non-consent penalty was enforceable against her. The 
trial court then severed the contract claims. The court of appeals reversed and 
rendered judgment in favor of Dorsett, holding that Valence failed to comply 
with the Model Form Agreement provisions for notice of proposed operations, thus 
making the non-consent penalty inapplicable to Dorsett. 111 S.W.3d at 235.
II. Standard of Review
We 
review the trial court's summary judgment de novo. Provident Life & 
Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215 
(Tex. 2003). When reviewing a 
summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and 
resolve any doubts in the nonmovant's favor. 
Knott, 128 S.W.3d at 215; Sci. 
Spectrum, Inc. v. 
Martinez, 941 S.W.2d 910, 
911 (Tex. 1997). When both parties 
move for partial summary judgment on the same issues and the trial court grants 
one motion and denies the other, as here, the reviewing court considers the 
summary judgment evidence presented by both sides, determines all questions 
presented, and if the reviewing court determines that the trial court erred, 
renders the judgment the trial court should have rendered. See FM Props. 
Operating Co. v. City of 
Austin, 22 S.W.3d 868, 
872 (Tex. 2000).
III. Notice 
Period
Dorsett 
argues that because Valence did not satisfy the Agreement’s notice requirements, 
her share of new production could not be reduced pursuant to the penalty. 
Dorsett interprets the Model Form Agreement to require Valence to deliver notice 
at least thirty days before the commencement of proposed operations. Valence 
argues that the Agreement requires notice of proposed subsequent operations to 
be given to working interest owners, who then have thirty days to elect to 
participate in the drilling of the well. Under Valence’s construction, the 
operator may commence work on the proposed operations during the thirty-day 
notice period or even before the thirty-day notice period begins. To support 
this interpretation, Valence argues that the phrase stating that the operator 
“shall, within sixty (60) days after the expiration of the notice period of 
thirty (30) days . . . actually commence work on the proposed operation and 
complete it with due diligence” illustrates that the provision’s purpose is not 
to prohibit the early commencement of work, but to ensure that work is not 
unreasonably delayed after the consent deadline. A.A.P.L. Form 610-1977, art. VI.B.2. 
(1977).
In 
construing a written contract, the primary concern of the court is to ascertain 
the true intentions of the parties as expressed in the instrument. J.M. 
Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 
(Tex. 2003); Gulf Ins. Co. v. 
Burns Motors, Inc., 22 S.W.3d 417, 423 
(Tex. 2000); Coker v. 
Coker, 650 S.W.2d 391, 393 
(Tex. 1983). To achieve this 
objective, courts should examine and consider the entire writing in an effort to 
harmonize and give effect to all the provisions of the contract so that none 
will be rendered meaningless. J.M. Davidson, Inc., 128 S.W.3d at 229; 
Coker, 650 S.W.2d at 393. Contract terms are given their plain, ordinary, 
and generally accepted meanings unless the contract itself shows them to be used 
in a technical or different sense. Heritage Res., Inc. v. NationsBank, 
939 S.W.2d 118, 121 (Tex. 1996); 
W. Reserve Life Ins. Co. v. Meadows, 
261 S.W.2d 554, 557 (Tex. 1953); 
see also Knott, 128 S.W.3d at 219.
The 
notice provision of the Model Form Agreement provides:
 
[T]he 
party desiring to drill, complete, rework, deepen or plug back such a well shall 
give the other parties written notice of the proposed operation, specifying the 
work to be performed, the location, proposed depth, objective formation and the 
estimated cost of the operation. The parties receiving such a notice shall have 
thirty (30) days after receipt of the notice within which to notify the parties 
wishing to do the work whether they elect to participate in the cost of the 
proposed operation . . . . Failure of a 
party receiving such notice to reply within the period above fixed shall 
constitute an election by that party not to participate in the cost of the 
proposed operation. . . .
 
. 
. . .
 
. 
. . [I]n order to be entitled to [impose the non-consent penalty], the party or 
parties giving the notice and such other parties as shall elect to participate 
in the operation shall, within sixty (60) days after the expiration of the 
notice period of thirty (30) days . . . actually commence work on the proposed 
operation and complete it with due diligence.
 
A.A.P.L. 
Form 610-1977, 
art. VI.B.1.-2. (1977).
We 
agree with Valence that this provision places no temporal limitation on 
Valence’s ability to commence work on the proposed projects. The Agreement 
clearly states that “[t]he parties receiving such a notice shall have thirty 
(30) days after receipt of the notice within which to notify the parties wishing 
to do the work whether they elect to participate in the cost of the proposed 
operation.” Id. art. VI.1. 
This plain language in the Agreement describes Dorsett’s right to receive notice 
of proposed operations and to elect to participate in those operations. It 
places no restrictions on when Valence may commence drilling or preparations for 
drilling. Dorsett does not dispute that she received notice of all of the 
proposed operations, nor does she contend that she elected to participate in the 
drilling of Mobley Wells 2 through 9. Her undisputed failure to consent to the 
proposed operations within thirty days was a “[f]ailure . . . to reply within the period above fixed” and 
“constitute[d] an election by that party not to participate in the cost of the 
proposed operation,” thus making the non-consent penalty applicable to Dorsett. 
Id.
In 
short, the thirty-day notice period sets a deadline for Dorsett to decide 
whether to participate in proposed operations. Nothing in the language of the 
Agreement forbids the operator from commencing work before the end of the notice 
period. However, there is a temporal limit in the Agreement on 
Valence that sets a deadline, not a 
required start date, on Valence’s 
commencement of work. The Agreement requires the operator to commence work no 
later than sixty days after the expiration of the thirty-day notice period. 
A.A.P.L. Form 610-1977, art. VI.B.2. (1977). The distinction 
between the two notice periods in the Agreement retains the working interest 
owner’s right to thirty days notice before being required to make a decision, 
while also requiring the operator to commence work no later than ninety days 
after formally proposing the operation to the interest owners.[3]
This 
interpretation effectuates the written agreement of the parties. We recognize 
that this interpretation allows an operator to commence a new operation before 
the thirty-day notice period has expired; however, potential benefits may accrue 
to the owners for an operator’s “early” commencement. For example, an early 
start may avoid detrimental occurrences such as the draining of an oil field by 
a neighboring operator or the expiration of an oil and gas lease. Moreover, the 
risk of early commencement of such operations falls entirely on the operator 
because if none of the working interest owners consent to participation within 
thirty days, the operator bears the full cost of operations. The parties do not 
identify any negative consequences to the working interest owners that arise 
from commencement of operations within the thirty-day notice period.
IV. Non-Consent Penalty
Dorsett 
received notice of each of the proposed subsequent operations. She acknowledges 
that she did not consent to any of the proposed operations within thirty days of 
receiving notice. She therefore is a non-consenting party under Article VI.B.1. 
of the Model Form Agreement, and the non-consent penalty applies to her.
The 
relevant portion of the Model Form Agreement provides:
 
“Upon 
commencement of operations for the drilling, completing, reworking, deepening or 
plugging back of any such well by Consenting Parties in accordance with the 
provisions of this Article, each Non-Consenting Party shall be deemed to have 
relinquished to Consenting Parties, and the Consenting Parties shall own and be 
entitled to receive, in proportion to their respective interests, all of such 
Non-Consenting Party’s interest in the well and share of production therefrom until the proceeds of the sale of such share, 
calculated at the well, or market value thereof if such share is not sold . . . 
shall equal the total of the following:
 
(a) 
100% of each such Non-Consenting Party’s share of the cost of any newly acquired 
surface equipment . . . plus 100% of each such Non-Consenting Party’s share of 
the cost of operation of the well commencing with first production and 
continuing until each such Non-Consenting Party’s relinquished interest shall 
revert to it under other provisions of this Article . . . ; and
 
(b) 
300% of that portion of the costs and expenses of drilling reworking, deepening, 
or plugging back, testing and completing, after deducting any cash contributions 
received under Article VIII.C., and 300% of that portion of the cost of newly 
acquired equipment in the well . . . , which would have been chargeable to such 
Non-Consenting Party if it had participated therein.”
 
A.A.P.L. 
Form 610-1977, 
art. VI.B.2. (1977). This clause allows consenting parties to recoup up to 100 
percent of the non-consenting party’s share of the costs of any new surface 
equipment and operation of the well and up to 300 percent of the non-consenting 
party’s share of the costs and expenses of drilling and new equipment in the 
well, subject to deductions. After the consenting parties have recouped these 
costs, then the non-consenting party returns to sharing in production revenues 
in proportion to his or her ownership interest. 
Id.; see also Nearburg v. Yates Petroleum Corp., 943 P.2d 
560, 565 (N.M. Ct. App. 1997) (explaining operation of the Model Form 
Agreement's non-consent penalty provision).
Whether 
a contract term is a liquidated damages provision is a question of law for the 
court to decide. Phillips v. Phillips, 820 S.W.2d 785, 788 
(Tex. 1991) (citing Farrar v. 
Beeman, 63 
Tex. 175, 181 (1885)). Dorsett 
contends that the non-consent penalty is an unenforceable liquidated damages 
provision. We disagree. This clause is different from a liquidated damages 
clause. Liquidated damages clauses fix in advance the compensation to a party 
accruing from the failure to perform specified contractual obligations, whereas 
non-consent penalties reward consenting parties for undertaking a defined risk. 
See Nearburg, 943 P.2d at 567 (“[T]he 
non-consent penalty is the agreed-upon reward to [a consenting party] for taking 
the risk . . . . As a contractual arrangement, the carried interest is subject 
to negotiation and modification, and the parties’ rights and obligations depend 
upon their contract.”); Restatement 
(Second) of Contracts § 356 (1981) (“Damages for breach by either party 
may be liquidated in the agreement but only at an amount that is reasonable in 
the light of the anticipated or actual loss caused by the breach and the 
difficulties of proof of loss.”). The non-consent penalty provision in this oil 
and gas operating agreement is the mechanism utilized to allow the consenting 
parties the opportunity to recover their investments and receive defined returns 
from future operations. For such operations, they undertake a financial risk 
that the non-consenting parties do not. Here, the non-consenting party is not 
being punished for breaching a contract; she simply agreed not to participate in 
a return on an investment she did not make. Indeed, after the provision’s 
requirements are met, she receives additional revenues from new wells for which 
she paid nothing. One Texas court 
of appeals, in its consideration of whether a non-consent penalty was 
enforceable, characterized the penalty as a liquidated damages clause and 
decided that it was enforceable against the non-consenting working interest 
owner. Hamilton v. Tex. Oil & Gas Corp., 648 S.W.2d 316, 321 (Tex. 
App.CEl 
Paso 1982, writ ref’d n.r.e.). While 
Hamilton reached the correct 
result, we disapprove of its treatment of the non-consent penalty as a 
liquidated damages provision.
There 
is a second reason why Dorsett’s assertion is unpersuasive. Assuming, arguendo, that Dorsett was correct in claiming that 
the non-consent penalty is a liquidated damages clause, her argument still fails 
because, traditionally, liquidated damages are recoverable only where there has 
been a failure to perform contractual obligations. Phillips, 820 S.W.2d 
at 788; Rio Grande Valley Sugar Growers, Inc. v. Campesi, 592 S.W.2d 340, 342 n.2 
(Tex. 1979). As the court in Nearburg noted, “a non-consent election cannot 
convincingly be characterized as a breach. . . . Therefore, we do not regard the 
non-consent penalty provision as involving liquidated damages or an 
unenforceable penalty.” Nearburg, 943 P.2d at 
566. We have held that Valence 
complied with the terms of the Agreement by properly sending notices to Dorsett. 
Dorsett failed to consent to the proposed operations. Neither party breached the 
contract.
To 
interpret the provision as Dorsett suggests would not only contradict its plain 
language, but would vanquish the incentive for parties to consent and incur 
costs and liabilities for new projects. If all working interest owners shared 
equally in production revenues from subsequent projects, whether they consented 
or not, none would consent because there would be no incentive to do so. In 
fact, the incentives would strongly favor not consenting because, under 
Dorsett’s approach, a non-consenting party would be able to reap the rewards of 
new operations without incurring any expense. The non-consent penalty is 
designed to allow reasonable compensation for working interest owners who 
undertake the risk of developing new wells. See Phillips, 820 S.W.2d at 
788. Other terms sometimes used to describe the non-consent penaltyC“sole 
risk clause” and “risk charges”Cmore 
accurately convey this rationale. See 111 S.W.3d at 226 n.1.
V. Conclusion
We 
conclude that Valence provided timely notice to Dorsett of its proposed 
subsequent operations; consequently, Valence did not breach the Agreement. The 
non-consent penalty is not an unenforceable liquidated damages provision and is 
enforceable against Dorsett. Therefore, we reverse the court of appeals’ 
judgment and render judgment that Dorsett take nothing.
 
_______________________________________
J. 
Dale Wainwright
Justice
 
OPINION 
DELIVERED: May 20, 
2005 




[1] The parties modified several provisions of the Model 
Form Agreement, but none of the changes affect the outcome of this 
case.

[2] We do not agree that this non-consent penalty is, as 
its name suggests, a forfeiture or punitive provision, but we will use the 
industry's nomenclature.

[3] The resolution of this case does not require us to 
determine whether the phrase “actually commence work,” as used in the Model Form 
Agreement, requires the commencement of drilling or the commencement of other 
preparatory work no later than ninety days after formally proposing the 
operation. Therefore, we express no opinion on this issue.