Affirmed and Majority and Dissenting Opinions filed February 24, 2009








Affirmed
and Majority and Dissenting Opinions filed February 24, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00069-CV

____________

 

XTO ENERGY INC., Appellant

 

V.

 

SMITH PRODUCTION INC., Appellee

 



 

On Appeal from the 281st
District Court

Harris County, Texas

Trial Court Cause No. 2004-68579

 



 

M A J O R I T Y   O P I N I O N








In this contract-interpretation case, we determine whether
the trial court properly granted summary judgment in favor of the operator of
an oil and gas lease based on language in two joint operating agreements
pertaining to the parties= notification of intent to participate in
proposed drilling operations.  A non-operator working-interest owner brought
breach-of-contract claims against the operator under these two agreements,
seeking specific performance as well as damages.  The trial court granted
summary judgment in favor of the operator.  We must determine whether, under
the agreements, a party who has received notice of a proposed drilling
operation may change its election and decide to participate in the operation within
thirty days of receiving notice of the proposed operation, after that party
first responded by giving notice of its election not to participate. As a
matter of apparent national first impression, we conclude that, under the
unambiguous language of the agreements, such a party may not change its
election after it gives notice of its election to the proposing party. 
Therefore, we affirm the trial court=s judgment.  

I.  Factual and Procedural Background

At the times relevant to this appeal, appellee Smith
Production Inc. (ASmith@) was an operator
under two joint operating agreements (AJOAs@)[1]
governing exploration and production on an oil and gas lease known as the
Bloomberg Lease (the ALease@).  The following
parties to the JOAs were non-operating working-interest owners:  Chevron U.S.A.
Inc. (AChevron@), Moran Resources
Company, CNR Production, LLC, and Frost National Bank as trustee for Franke
Interests, Inc. (collectively ANon-Operating Interest Owners@).

In May
2004, Chevron contracted to sell certain oil and gas properties to appellant XTO
Energy Inc. (AXTO@), including Chevron=s working interest in the Lease.  A
Chevron vice-president, who was in charge of the assets being sold, directed
Chevron employees to operate under Athe guidelines of business as usual@ with respect to any properties
involved in the transfer.  As part of her directive, the vice-president advised
employees by email as follows:








The Asset
Sale Agreement does not require that we need to obtain XTO=s consent for AFE=s
[authorization for expenditures], purchases[,] or new drills; however, we
should consult with XTO as a courtesy on any significant (over $100,000)
matters considering that the effective date of the transaction is January 1,
2004 and all expenses will be deducted from the purchase price.  We should not
go non-consent on any AFE=s without prior consultation with XTO.

Under the JOAs, in May and June of 2004, Smith gave written
notices to the Non-Operating Interest Owners of its proposal to drill four more
wells on the Lease.  Under the JOAs, the Non-Operating Interest Owners had
thirty days after receipt of the notices within which to notify Smith whether
they would elect to participate in the cost of the proposed operations.  After
analyzing geological data and other information, Chevron decided that it did not
wish to participate in the costs of the four proposed wells.  Without
consulting with XTO and within the thirty-day period for responding, Chevron
notified Smith that it elected not to participate in the cost of the four
proposed wells.  

When Chevron notified Smith of its elections on June 17,
2004, all the other Non-Operating Interest Owners already had notified Smith of
their elections to participate in the cost of the four wells.  Shortly after
receiving Chevron=s notification, Smith advised the other
Non-Operating Interest Owners of the total interest of the parties approving
the operations.  By June 22, 2004, the other Non-Operating Interest Owners all
advised Smith that they agreed to carry their proportionate share of Chevron=s interests.  On
June 24, 2004, still within thirty days of Chevron=s receipt of Smith=s notices
proposing the four wells, Chevron sent Smith a letter containing four signed
AFEs.  In this letter, Chevron stated that it elected to participate in the
cost of the four proposed wells and that it was revoking its prior
notifications to the contrary, explaining that the June 17, 2004 notices had
been sent in error. 








          In
a letter Smith responded by asserting that Chevron could not revoke its prior
notifications and that Smith still considered Chevron=s June 17, 2004
elections to be effective.  Because of this position, Smith treated Chevron as
a ANon-Consenting
Party@ rather than a AConsenting Party@ under the JOAs. 
Treating Chevron as a Non-Consenting Party would mean that, under a provision
of the JOAs, upon commencement of operations for the drilling of the four wells
in accordance with the JOAs, Chevron would be deemed to have relinquished to
the other parties, and the other parties would own and be entitled to receive,
in proportion to their respective interests, all of Chevron=s interest in the
well and share of production therefrom until the proceeds of the sale of such
share, calculated at the well, or market value thereof if such share is not
sold, after various deductions,  equals the total of the following:  400
percent of the Chevron=s share of the costs and expenses of
drilling, testing, and completing the new wells after certain deductions, 400
percent of Chevron=s share of the cost of newly acquired
equipment in the wells, 100 percent of the Chevron=s share of the
costs of any newly acquired surface equipment, and 100 percent of Chevron=s share of the
well operations costs from the first production until Chevron=s relinquished
interests revert to it (ANon-Consent Provision@).[2] 
After the other parties recoup these costs, then Chevron would return to
sharing in production revenues in proportion to its ownership interest. 








In August 2004, Chevron and XTO closed on the asset
purchase agreement, and XTO became the successor in interest to Chevron=s working
interest.  The four wells at issue have been producing oil, and Smith has been
applying the Non-Consent Provision to XTO=s interests.  In
December 2004, XTO filed suit for breach of contract and specific performance
against Smith.  XTO claimed that Smith breached the agreement by not accepting
Chevron=s notifications
purporting to change its elections.  XTO asserts that Chevron had the ability
to change its elections within thirty days of receiving Smith=s notices
proposing the four wells, provided that the other parties had not materially
changed their positions in reliance on the initial elections.  Therefore, XTO
asserts, its interest should not be subject to the Non-Consent Provision. 
Smith moved for summary judgment on the basis that the unambiguous language of
the JOAs does not allow a party to change its election after it has notified
the proposing party of its election.  XTO submitted two affidavits from an
expert in the oil and gas industry who purported to provide opinions as to the
custom and trade usage within that industry.  The trial court granted Smith=s motion and
ordered that XTO take nothing on its claims against Smith.  The trial court
also struck the expert=s affidavits Ato the extent such
affidavits attempt to use custom and usage in the industry to establish
ambiguity.@

II.  Issues Presented

On appeal, XTO argues that the trial court erred in
granting Smith=s motion for summary judgment and in striking its
expert=s affidavits as to
custom and trade usage.[3] 
XTO asserts that the JOAs are unambiguous and allowed Chevron to change its
election within thirty days of receiving Smith=s notices
proposing the four wells, as long as, prior to Chevron=s notification of
this change, the other parties had not materially changed their positions in
reliance on Chevron=s initial election.  In the alternative,
XTO asserts that the trial court should have considered its expert=s testimony
regarding custom and trade usage and that the JOAs are ambiguous.  

 

III.  Standards of Review








In a traditional motion for summary judgment, if the movant=s motion and summary-judgment
evidence facially establish its right to judgment as a matter of law, the
burden shifts to the nonmovant to raise a genuine, material fact issue
sufficient to defeat summary judgment.  M.D. Anderson Hosp. & Tumor
Inst. v. Willrich, 28 S.W.3d 22, 23 (Tex. 2000) (per curiam).  In our de novo
review of a trial court=s summary judgment, we consider all the
evidence in the light most favorable to the nonmovant, crediting evidence
favorable to the nonmovant if reasonable jurors could, and disregarding
contrary evidence unless reasonable jurors could not.  Mack Trucks, Inc. v.
Tamez, 206 S.W.3d 572, 582 (Tex. 2006).  The evidence raises a genuine
issue of fact if reasonable and fair-minded jurors could differ in their
conclusions in light of all of the summary-judgment evidence.  Goodyear Tire
& Rubber Co. v. Mayes, 236 S.W.3d 754, 755 (Tex. 2007) (per curiam). 
When, as in this case, the order granting summary judgment does not specify the
grounds upon which the trial court relied, we must affirm the summary judgment
if any of the independent summary-judgment grounds is meritorious.  See FM
Props. Operating Co. v. City of Austin, 22 S.W.3d 868, 872 (Tex. 2000).  

In construing the language of the JOAs, our primary concern
is to ascertain and give effect to the intentions of the parties as expressed
in the contracts.  Kelley‑Coppedge, Inc. v. Highlands Ins. Co.,
980 S.W.2d 462, 464 (Tex. 1998).  To ascertain the parties= true intentions,
we examine the JOAs in their entirety in an effort to harmonize and give effect
to all of their provisions so that none will be rendered meaningless.  MCI
Telecomms. Corp. v. Tex. Utils. Elec. Co., 995 S.W.2d 647, 652 (Tex.
1999).  Terms in a contract are given their plain, ordinary and generally
accepted meanings unless the contract itself shows the terms to be used in a
technical or different sense.  Heritage Res., Inc. v. NationsBank, 939
S.W.2d 118, 121 (Tex. 1996).  Whether a contract is ambiguous is a question of
law for the court.  Id.  A contract is ambiguous when its meaning is
uncertain and doubtful or is reasonably susceptible to more than one
interpretation.  Id.  However, when a written contract is worded so that
it can be given a certain or definite legal meaning or interpretation, it is
unambiguous, and the court construes it as a matter of law.  Am.  Mfrs. Mut.
Ins. Co. v. Schaefer, 124 S.W.3d 154, 157 (Tex. 2003). 

 

IV.  Issues and Analysis

The language at issue is contained in both JOAs.  Article
VI.B of the JOAs sets forth procedures the parties must follow when a new well
is proposed:








B.      Subsequent
Operations:

1.  Proposed Operations:  Should any party
hereto desire to drill any well on the Contract Area other than the [initial
well], . . . the party desiring to drill . . . such a well shall give the other
parties written notice of the proposed operation, specifying the work to be
performed, the location, proposed depth, objective formation and the estimated
cost of the operation.  The parties receiving such a notice shall have thirty
(30) days after receipt of the notice within which to notify the party wishing
to do the work whether they elect to participate in the cost of the proposed
operation.  If a drilling rig is on location, notice of a proposal to rework,
plug back or drill deeper may be given by telephone and the response period
shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday, and
legal holidays.  Failure of a party receiving such notice to reply within the
period above fixed shall constitute an election by that party not to
participate in the cost of the proposed operation.

. . .

2.  Operations by Less than All Parties:  If
any party receiving such notice as provided in Article VI.B.1. . . . elects not
to participate in the proposed operation, then, in order to be entitled to the
benefits of this Article, the party or parties giving the notice and such other
parties as shall elect to participate in the operation shall, within ninety
(90) days after the expiration of the notice period of thirty (30) days (or as
promptly as possible after the expiration of the forty-eight (48) hour period
when a drilling rig is on locations, as the case may be) actually commence the
proposed operation and complete it with due diligence.

If less than all parties approve any proposed
operation, the proposing party immediately after the expiration of the
applicable notice period, shall advise the Consenting Parties of the total
interest of the parties approving such operation and its recommendation as to
whether the Consenting Parties should proceed with the operation as proposed.
Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday,
Sunday and legal holidays) after receipt of such notice, shall advise the
proposing party of its desire to (a) limit participation to such party=s interest as shown on Exhibit AA@ or (b) carry its proportionate part of
Non-Consenting Parties= interests, and failure to advise
the proposing party shall be deemed an election under (a).

If the
Consenting Parties comply with the requirements of Article VI.B.2., then the
interest of any Non-Consenting Party is subject to the Non-Consent Provision
discussed above.








A.      Is Smith=s construction of
Article VI of the JOAs reasonable?

 Under Smith=s construction of
the JOAs, if, after proper notice of a proposal to drill an additional well
under Article VI.B.1.,[4]
a party to the JOAs timely and properly gives notice to the proposing party as
to whether it elects to participate in the cost of the proposed operation, then
that party may not change its election, even if it seeks to do so within thirty
days after receipt of the notice of the proposed operation.  There is no
language in the JOAs expressly allowing an electing party to change its
election once it has notified the proposing party of the election.  Nor is
there language expressly disallowing such a change in election.  However,
allowing such a change in election would conflict with the intent of the
parties as expressed in the unambiguous language of Article VI.B.  








There is no provision in the JOAs stating that the
proposing party must wait thirty days before it examines elections of the other
parties.  Rather, under the JOAs, after receiving notice of a proposed
operation, a party has thirty days to notify the proposing party whether the
receiving party elects to participate in the cost of the proposed operation (ANotice Period@).  Failure of the
receiving party to give notice of its election within thirty days constitutes
an election by that party not to participate.  Once a receiving party timely
gives notice of its election regarding the drilling operation by properly
replying within the thirty days, the Notice Period has expired as to that
party.  Under the language of the JOAs, a receiving party does not have thirty
days to give notice of an election and to give notice of a change in a prior
election.  Rather, a receiving party only has thirty days to notify of its
election.  Once all parties have communicated their elections regarding the
proposed operation, the Notice Period has expired.[5]
When, as in this case, all receiving parties give notice of their elections in
less than thirty days after receiving the notice, the Notice Period expires in
less than thirty days.[6] 
Likewise, if fewer than all the parties approve any proposed operation, then
the proposing party Aimmediately after the expiration of the
[Notice Period], shall advise the Consenting Parties of the total interest of
the parties approving such operation and its recommendation as to whether the
Consenting Parties should proceed with the operation as proposed.@  The Consenting
Parties then have 48 hours, excluding weekends and holidays, to advise the
proposing party whether they desire to carry their proportionate part of
Non-Consenting Parties= interests.  To be entitled to the
benefits of Article VI, the party or parties giving the notice and the parties
electing to participate in the operation, within ninety days after the
expiration of the Notice Period, actually must begin drilling the proposed well
or wells.

Construing Article VI to not allow changes in election by
the receiving parties is consistent with the provisions of the JOAs requiring
the proposing party to notify the Consenting Parties of any Non-Consenting
Party Aimmediately after@ the expiration of
the Notice Period and to begin drilling within ninety days.  Therefore, we
conclude that  Smith=s construction of Article VI of the JOAs
is reasonable.








B.      Is there
another reasonable construction of Article VI of the JOAs?

XTO asserts that a reasonable construction of Article VI is
that, after receiving proper notice of a proposal to drill an additional well
under Article VI.B.1., a party is entitled to change its election within thirty
days after receipt of the notice, provided that the other parties have not
materially changed their positions in reliance on the initial election. 
However, this construction is not grounded in the language of Article VI. 
Article VI contains no reference to whether the other parties have changed
their positions in reliance on another party=s election or
whether any such change is material.  Likewise, the provision contains no
reference to a party=s ability to change a prior election. 
Additionally, if a party could change its election if the other parties had not
materially changed their positions in reliance on the initial election, it is
not clear why the ability to exercise such a privilege would be limited to
thirty days after receipt of the proposing party=s notice.  If a
party inadvertently sent notice of its election to participate 33 days after
receiving notice and if no party had materially changed its position in
reliance on the initial deemed election of non-participation, it is not clear
why the passage of thirty days would stop a party from changing its election to
one of participation. 

This construction also conflicts with language indicating
that, once all of the receiving parties have given notice of their respective
elections, the Notice Period is over.  For example, if all parties had elected
to participate on the seventh day following receipt of notice, then the Notice
Period would expire on the seventh day.  However, if on the twenty-eighth day,
one party decided to change its election to an election not to participate,
then the proposing party would have the contractual obligation to notify the
Consenting Parties of the Non-Consenting Party=s election Aimmediately after@ the expiration of
the Notice Period, which was on the seventh day. 








In addition, in operations that are often time-sensitive,
timely notification to the proposing party is important so that the proposing
party can make financial arrangements, begin drilling within ninety days, and
complete the well with due diligence.  XTO=s construction
replaces a bright-line contractual rule for promptly and clearly determining
who is a Consenting Party and who is a Non-Consenting Party with an uncertain
rule that requires a determination of whether  the other parties materially
changed their positions in reliance on the initial election.  This construction
would not be faithful to the language the parties chose and would introduce
uncertainty as to whether each party is a Consenting Party or a Non-Consenting
Party.  This construction also creates uncertainty as to the respective share
of the drilling costs to be paid by the Consenting Parties.  XTO argues that,
before allowing a receiving party to change its election, it is important to
make sure that the other parties have not changed their positions in some
material respect in reliance on the initial election; otherwise, as to quickly
drilled wells, a party might change its election to avoid dry-hole costs that
the party previously agreed to bear or to share in the rewards of a successful
well when the party had not shared in the risks.  However, adding this
material-reliance requirement has no foundation in the language of the JOAs,
and it adds uncertainty and a higher likelihood of litigation to determine
which parties are Consenting Parties and which are Non-Consenting Parties.








XTO asserts that Smith=s construction is
unreasonable because it provides no means by which a receiving party can
correct an erroneous notification of election.  However, the parties to the
JOAs are free not to allow changes in notifications of elections, perhaps to
add clarity and expedition to the process of planning, paying for, and
executing additional drilling operations.  Likewise, the parties are free to
provide for means of changing an erroneous election.  This court must enforce
the JOAs as written and cannot rewrite the agreements or add to their language
under the guise of interpretation.  See Schaefer, 124 S.W.3d at
161B62.  If allowing a
receiving party to change its election is not supported by the language of the
JOAs, this court cannot add a such a provision to the JOAs.  See id; Nearburg
v. Yates Petroleum Corp., 943 P.2d 560, 568B70 (N.M. Ct. App.
1997) (refusing to read such a provision into the agreement and  reversing
trial court=s judgment, in which the trial court allowed a
receiving party in a joint operating agreement to change a prior election that
was Adue to
inadvertence@ because it did so before the other parties were
prejudiced or had detrimentally relied on the first election).  Furthermore,
other model form operating agreements include a provision expressly allowing a
receiving party to change its election if it gives the other parties written
notice at any time before actual spudding of the proposed well.  See
Rocky Mountain Oil & Gas Ass=n Form 3, Art. 9, ' 9.2 (1959) &
Form 2, Art. 8, ' 8.6 (1955), reprinted in 7 Howard R.
Williams & Charles J. Meyers, Oil and Gas Law, '' 920.4, 920.5.
(1995); see also Nearburg, 943 P.2d at 570.  Although model forms
of joint operating agreements are in widespread use, parties to each agreement
are free to revise or add provisions to the form they are using to suit their
agreement and the particular transaction.  The parties to the JOAs in this case
changed other provisions of the Model Form they were using, but they did not
add a provision allowing a receiving party to change an election.  See
Nearburg, 943 P.2d at 570.








          For
these reasons, we conclude that XTO=s construction is
not reasonable and that Smith=s construction is the only reasonable
construction of the language at issue.[7]
Because this language is worded so that courts can give these parts of the JOAs
a certain and definite legal meaning and construction, the contract language is
unambiguous, and this court construes it as a matter of law.  Schaefer,
124 S.W.3d at 157.  We have not found any state or federal decision addressing
the specific issue in this case, and it appears to be an issue of first impression. 


Nonetheless, two cases provide some guidance. In Valence
Operating Co. v. Dorsett, in addressing issues different that those in the
instant case, the Supreme Court of Texas construed Article VI of the 1977
version of the Model Form used to create the JOAs.  See 164 S.W.3d 656,
661B65 (Tex. 2005). 
Though the Valence court answered different questions, it analyzed the
same parts of an Article VI provision substantially similar to the language in
the JOAs.  See id at 661B63.  The Valence court concluded
that the language of Article VI is unambiguous and that it describes the
receiving party=s Aright to receive
notice of proposed operations and to elect to participate in those operations.@  See id.
at 661B65.  The Valence
court did not mention any right to change the election.  See id. 
Though that issue was not before the Valence court and though its
description of Article VI does not dispose of the present issue,  Smith=s position is
consistent with the description of Article VI in Valence. See id. 









In addition, in concluding that the Non-Consent Provision
in Valence was not an unenforceable liquidated damages provision, the Valence
court cited favorably the Nearburg case from  New Mexico.  See id.
at 663B65 (citing Nearburg
with approval); Nearburg, 943 P.2d at 566B70.  The  Nearburg
court construed Article VI of the 1977 version of the Model Form used to
create the JOAs.  See id.  The Nearburg court analyzed the
same parts of an Article VI provision substantially similar to the language in
the JOAs.  See id.  Nearburg involved a party who sought to
change its election more than thirty days after receiving notice of a proposal
to drill a new well, based on alleged inadvertence in not timely responding;
therefore, the issue was not the same as that in the present case. 
Nonetheless, the Nearburg court held that the unambiguous language of
Article VI does not allow a party to change its election after the passage of
thirty days, even if the failure to respond was inadvertent.  See id. 
The analysis of the Nearburg court supports Smith=s construction of
the JOAs.

  Under the unambiguous language of the JOAs, if, after
proper notice of a proposal to drill an additional well under Article VI.B.1.,
a party to the JOAs timely and properly gives notice to the proposing party as
to whether it elects to participate in the cost of the proposed operation, then
that party may not change its election, even if it seeks to do so within thirty
days after receipt of the proposing party=s notice and
regardless of whether the other parties have materially changed their positions
in reliance on the initial election.[8] 


C.      Is XTO=s expert testimony relevant to the
analysis?








XTO submitted two affidavits from an expert purporting to
address the custom and usage of the oil and gas industry.  By this evidence,
XTO did not purport to provide the meaning of any technical or specialized
terms used in the JOAs.  XTO tried to use this evidence to show that its
interpretation of Article VI is reasonable and to assist in the construction of
the JOAs.  Presuming, without deciding, that it would be proper to use evidence
of custom and usage in the oil and gas industry for these purposes, we conclude
that XTO=s expert did not
show that the alleged custom and usage to which he testified is so general and
universal that the parties to the JOAs are charged with knowledge of its
existence to such an extent to raise a presumption that they dealt with
reference to it.  See State Nat. Bank of Houston v. Woodfin, 146 S.W.2d
284, 286 (Tex. Civ. App.CGalveston 1940, writ ref=d) (stating that A[i]t has been
uniformly held in this State that a custom, in order to constitute an element
of contract, must be either shown to have been known personally to the parties
to the contract, or to have been so general and universal that the parties are
charged with knowledge of its existence to such an extent as to raise a
presumption that they dealt with reference to it@); Energen Res.
MAQ, Inc. v. Dalbosco, 23 S.W.3d 551, 554B56 (Tex. App.CHouston [1st
Dist.] 2000, pet. denied) (stating same legal standard as Woodfin and
concluding that testimony was sufficient to raise a fact issue as to custom and
usage in case in which witnesses testified that the alleged custom and usage
was typical and Acommon knowledge in the industry@); Grube v.
Donnell Exploration Co., 286 S.W.2d 179, 180B81 (Tex. Civ. App.CEl Paso 1955, writ
ref=d n.r.e.) (holding
that purported evidence of custom regarding drilling of oil and gas wells was
insufficient because it did not show that the alleged custom was established
for a sufficient length of time to have become generally known, certain, and
uniform).  Therefore, even if the trial court erred in striking this evidence,
it would not be reversible error.  Even if the this court could consider
alleged custom and usage in the oil and gas industry in giving effect to the
unambiguous JOAs, XTO did not prove any such custom and usage.  Therefore, the
testimony of XTO=s expert does not change our analysis.

                                                 V.
Conclusion








Under the unambiguous language of each of the JOAs, if,
after proper notice of a proposal to drill an additional well under Article
VI.B.1., a party to the JOA timely and properly gives notice to the proposing
party as to whether it elects to participate in the cost of the proposed
operation, then that party may not change its election, even if it purports to
do so within thirty days after receipt of the notice of the proposed operation
and regardless of whether the other parties have materially changed their
positions in reliance on the initial election.  XTO did not prove the alleged
custom and usage in the oil and gas industry.  Therefore, any alleged custom
and usage does not affect the construction of the JOAs.  Because the trial
court did not err in granting Smith=s motion for
summary judgment, we overrule XTO=s issues and
affirm the trial court=s judgment.

 

 

 

/s/      Kem Thompson Frost

Justice

 

 

Panel
consists of Justices Frost, Seymore, and Guzman. (Guzman, J., dissenting).

 

 









[1]  The joint operating agreements are both based on the
American Association of Petroleum Landmen  Model Form Operating Agreement
610-1982.





[2]   This provision is often called a Anon-consent penalty,@ although one member of the Supreme Court of Texas has suggested that
it would be more appropriate to call this provision a Aliquidated bonus clause.@ See Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 659 n.2,
663B65 (Tex. 2005); id. at 665B66 (Brister, J., concurring).





[3]  XTO also asserts that the trial court erred in
denying its motion for partial summary judgment; however, we cannot review XTO=s motion because, in this motion, XTO did not seek a
final judgment. See CU Lloyd=s of Tex. v. Feldman, 977
S.W.2d 568, 569 (Tex.1998) (stating that, before a court of appeals may review
an order denying a cross-motion for summary judgment not covered by an
interlocutory appeal statute, both parties must have sought final judgment in
their cross-motions for summary judgment, unless an exception applies that is
not applicable to the instant case).





[4]  This case involves the drilling of four additional
wells.  Therefore, we limit our analysis to the provisions of the JOAs dealing
with additional operations for drilling additional wells.





[5]  Our dissenting colleague asserts that, under the
JOAs, the parties expressly provide that the Notice Period expires thirty days
after the receiving party receives the notice.  See post at pp. 6,7,9. 
This is incorrect.  The parties expressly provide that each receiving party has
thirty days after receipt of the notice within which to notify the proposing
party whether that receiving party elects to participate in the cost of
the proposed operation.  This is not an express agreement that the Notice
Period always lasts thirty days.  It is an express agreement that the receiving
parties have thirty days to give the proposing party notice of their respective
elections.  Under this agreement, the receiving parties may choose to take the
entire thirty days, or they may give notice in less than thirty days.  In the
latter case, the Notice Period does not last thirty days.

 





[6]  After stating that the receiving parties have thirty
days after receipt of notice to reply to the proposing party, the parties
agreed that failure of a receiving party to reply Awithin the period above fixed@ constitutes an election by that party not to
participate.  Our dissenting colleague focuses on the word Afixed@ and concludes
that the parties expressly agreed that the Notice Period cannot expire in less
than thirty days.  See post at p.6. However, this language simply refers
back to the Notice Period established when the parties agreed that the
receiving parties Ahave thirty (30) days after receipt of the notice
within which to notify the party wishing to do the work whether they elect to
participate in the cost of the proposed operation.@  Therefore, the words emphasized by our dissenting
colleague refer to an earlier sentence and do not aid in this court=s construction of that earlier sentence.





[7]  Our dissenting colleague concludes that the JOAs are
ambiguous and that this court should reverse and remand so that a jury may
determine the parties= mutual intent in agreeing to the language of this
Model Form.  See post at pp. 9B10. 
In reaching this conclusion, our dissenting colleague relies on Oxley v.
General Atlantic Res., Inc.  See 936 P.2d 943, 944B46 (Okla. 1997).  The Oxley case did not
involve Article VI; rather, it involved language regarding the selection of a
new operator under an agreement based on the American Association of Petroleum
Landmen Model Form Operating Agreement 610-1956.  See id. The issue in Oxley
was whether a party to a joint operating agreement could change its vote for
successor operator.   See id. This issue is somewhat similar to the
issue in the instant case; nonetheless, the relevant contract language in Oxley
was different.  See id.  In addition, the Oxley court held that
the operating agreement in that case was ambiguous because, under Oklahoma law,
if a contract does not expressly address the issue in question, then that
contract is ambiguous.  See id. at 945.  The Oxley court only
addressed evidence regarding custom and usage because it previously had
determined that the contract was ambiguous. See id. at 946.  However,
the Oxley court=s ambiguity analysis is contrary to Texas law, under
which the failure of the parties to expressly address an issue in their
contract does not make the contract ambiguous.  See Seagull Energy E&P,
Inc. v. Eland Energy, Inc., 207 SW.W.3d 342, 345, 347 (Tex. 2006); Columbia
Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 591 (Tex.
1996).  Under Texas law, even absent an express agreement, the issue remains
whether there is only one reasonable interpretation, and there may be only one
reasonable interpretation based on a review of the language of the contract. See
Seagull Energy E&P, Inc., 207 SW.W.3d at 345; Columbia Gas
Transmission Corp., 940 S.W.2d at 591. Because of this fundamental
difference between Oklahoma law and Texas law, the Oxley court=s analysis is not on point or persuasive as to the
issues before this court today.





[8]  XTO cites Lenape Res. Corp. v. Tenn. Gas Pipeline
Co.  See 925 S.W.2d 565, 573B74
(Tex. 1996).  However, contrary to XTO=s
assertions, there are substantial differences between Tennessee Gas Pipeline=s contract construction arguments and Smith=s arguments in the instant case. See id. In
addition, the contract language in Lenape is not similar to the language
in the JOAs. See id. Lenape is not on point.